DANA S. HAWTHORNE, ADMINISTRATOR (ESTATE OF WILLIS JAQUISH) *vs.* BLYTHEWOOD, INC.

MALTBIE, C. J., HAINES, HINMAN, BANKS and AVERY, Js.

Argued June 5th—decided July 16th, 1934.

*Cyril Coleman,* with whom, on the brief, was *Lawrence A. Howard,* for the appellant (defendant).

*John M. Comley,* for the appellee (plaintiff).

HAINES, J.   The plaintiff is the administrator of the estate of Orin Willis Jaquish, deceased, and the defendant is a private sanitarium in the town of Greenwich.   The complaint alleged that on August 20th, 1931, the decedent was admitted as a patient in the sanitarium for the purpose of care and treatment for nervous and mental disorders from which he was then suffering, and that the defendant thereupon undertook to furnish such care and treatment, for compensation; that the defendant had knowledge that the decedent had suicidal tendencies and that his condition was such as to require constant nursing, and a twenty-four-hour attendant which the defendant agreed to provide; that owing to the negligence of the defendant in failing to provide proper care, supervision and attendance, and sufficient safeguards, the decedent escaped on August 27th, 1931, and as a result met his death by drowning.   The issues were submitted to the jury upon a general denial and the verdict was for the plaintiff.

Assigning as error the refusal of the trial court to

set aside the plaintiff's verdict, the defendant presents all the evidence for our inspection. It appears to be undisputed that that evidence supports the following facts: The decedent—a commercial artist—at the time of changes in his line of work in 1929, exhibited marked nervousness which gradually increased during the two years which followed and became so serious that in 1931 his wife consulted the Medical Center in New York City and was there recommended to Dr. Howe, an eminent neurologist; she and the decedent visited Dr. Howe on the 4th, 11th and 18th of June; Dr. Howe's diagnosis was that the decedent was suffering from a manic depressive psychosis which was always accompanied by suicidal tendencies; the decedent had frequently spoken to his wife about taking his own life and also when with her at one time in a boat he suggested that they turn it over and both go "out," and another time while driving across Bear Mountain Bridge he had stopped the car and gone to the edge of the bridge and looked down, but she followed him and he got back into the car; he had frequently threatened while in her presence to take his life if he had an opportunity; Dr. Howe recommended that he be sent to an institution because he otherwise might injure himself; in August the decedent's condition became so bad that Dr. Howe advised placing him in Blythewood Sanitarium and the following morning, August 20th, 1931, his wife went there, saw Dr. Adams of that institution, and made arrangements for the decedent's admission. He was brought there that evening and placed in a room on the second floor of a building which was detached from the main building; a special attendant was put in charge of him by the sanitarium and slept in the room with him that night; the following morning a permanent attendant was assigned to him and he slept each

night in the decedent's room and was present with him constantly, day and night, except for two or three hours during the evening, when another attendant took his place.  This continued uninterruptedly until two or three mornings before the decedent escaped, at which times the attendant left the decedent asleep and went down for a few minutes to the floor below to get his own breakfast; on the 26th the decedent's wife took the decedent for an automobile ride in the afternoon, but the attendant accompanied them at all times; the following morning the attendant left the decedent in bed, telling him it was not time for him to get up, and went down to his breakfast, remaining away for about a half hour; upon his return the decedent had disappeared and though persistent search was made, his whereabouts was not discovered until several days later when his body was found in a pond which is on the sanitarium property.  It is conceded that the decedent committed suicide.

His wife testified that upon her visit to the sanitarium on the morning of August 20th to arrange for the decedent's admission, she explained the decedent's condition to Dr. Adams, who thereupon insisted that the decedent must be in the hands of an attendant constantly both day and night and refused to admit him unless she was willing to pay for a twenty-four-hour attendant, the cost of which was $35 per week in addition to the regular charge of $75 per week.  She agreed to and paid for this.  Upon his admission, the decedent was given a "mental examination" by Dr. Adams, lasting about three-quarters of an hour.  Dr. Adams testified that his diagnosis was psychoneurosis, or nervous breakdown, and that he did not discover any suicidal tendency.  The jury thus had before them the conflicting views of Dr. Howe and Dr. Adams and in addition to other testimony they had the story of the

decedent's threats to commit suicide and Dr. Howe's statement that this condition was always an accompaniment of a manic depressive psychosis, as well as the additional fact that within about a week after his admission decedent had escaped and drowned himself. It was the jury's province to deal with this and all other evidence on this feature of the case, and we cannot say that it was unreasonable for them to decide that the decedent was suffering from a manic depressive psychosis with suicidal tendencies as claimed by Dr. Howe.

It was also their province to determine whether the sanitarium authorities knew or should have known this when he was admitted after mental examination. Mrs. Jaquish testified that she explained the decedent's "condition" to Dr. Adams. The evidence was all to the effect that it was his nervous and mental rather than his physical condition which brought about his admission to the sanitarium. Though all the details of what she said to Dr. Adams do not appear in the evidence, the doctor himself testified that he asked her if her husband had impulses or tendencies to suicide and that he thought he also questioned him upon the same subject. The jury could very properly have inferred that the condition which she says she explained to Dr. Adams, was his nervous and mental rather than his physical condition notwithstanding the disagreement in Dr. Adams' testimony, in some respects, upon this point. Dr. Adams testified that his insistence upon a twenty-four-hour attendant was for the purpose of keeping the decedent occupied and to insure that he would follow the activities prescribed for him. The plaintiff's position is, however, that attendance was not necessary for this purpose during the night season nor while the defendant was riding with his wife, and fur-

thermore that the twenty-four-hour attendance required was evidence that the sanitarium authorities recognized its necessity as a means of preventing an escape and a suicide attempt. The jury were entitled to give all this such weight as they saw fit in this connection and also to consider the testimony of Dr. Adams that very soon after the decedent disappeared it occurred to him that he might have committed suicide. With this and all other evidence upon this point before them, we conclude that the jury could not unreasonably have reached the conclusion that the sanitarium authorities knew, or should have known in the exercise of reasonable care, that there was an ever-present danger that the decedent would commit suicide if opportunity offered.

Independently of the above considerations, however, the defendant insists that it cannot be charged with negligence for the reason that the decedent was not committed to its custody by any court, that there was no evidence of voluntary submission to restraint, and that, there being no right on the part of the sanitarium to restrain the decedent, his escape and suicide did not render the defendant liable for negligence. The defendant relies upon *Hohmann* v. *Riverlawn Sanatorium,* 103 N. J. L. 458, 135 Atl. 817, in support of this proposition. No authorities are cited and few facts are given in that decision. It does appear, however, that the only duty which the sanitarium assumed in that case was "observation and medical treatment." It does not appear that the sanitarium authorities had any knowledge of a suicidal tendency on the part of the patient. It was held that the sanitarium having assumed no duty of restraint or confinement, his suicide after leaving was not the proximate result of any negligence on the part of the sanitarium. It is not difficult to find a lack of analogy between this case and

the present one. Here the jury were entitled to hold that the sanitarium knew, or was charged with notice, that this decedent was likely to commit suicide if not watched day and night. Under the circumstances his voluntary submission to the authority of the sanitarium raised an implied obligation on its part to give him such reasonable care and attention for his safety as his mental and physical condition required. *Wetzel v. Omaha Maternity and General Hospital Association,* 96 Neb. 636, 148 N. W. 582, Ann. Cas. 1915B, 1224; *Broz* v. *Omaha Maternity and General Hospital Association,* 96 Neb. 648, 148 N. W. 575, L. R. A. 1915D, 334; *Hogan* v. *Clarksburg Hospital Co.,* 63 W. Va. 84, 59 S. E. 943.

In *Mulliner* v. *Evangelischer Diakonniessenverein,* 144 Minn. 392, 394, 175 N. W. 699, it is said that when a patient enters a hospital maintained for private profit, he is entitled to such reasonable attention as his safety may require; and if he is temporarily bereft of reason, and is known by the hospital authorities to be in danger of self-destruction, the authorities are in duty bound to use reasonable care to prevent such an act. *Felzer* v. *Aberdeen Clinic,* 48 S. D. 308, 204 N. W. 364; see 22 A. L. R. 341-359, and cases cited therein; 39 A. L. R. 1431-1436, and cases cited. So far as we have been able to ascertain, the authorities are in practical accord upon this question and for reasons which we have indicated, we do not look upon the *Hohmann* case as in necessary conflict therewith.

The present defendant is not a charitable institution, as to which the rule is different. *Roosen* v. *Peter Bent Brigham Hospital,* 235 Mass. 66, 67, 68, 126 N. E. 392; *Hearns* v. *Waterbury Hospital,* 66 Conn. 98, 33 Atl. 595; *Cashman* v. *Meriden Hospital,* 117 Conn. 585, 169 Atl. 915; see also 14 A. L. R. 572-604 and cases therein cited.

Even if it were conceded that the sanitarium could not have legally restrained this decedent and prevented his leaving the building and going to the pond, it does not follow that it was free from negligence in failing to have an attendant with him when he did so. The sanitarium had assumed for a consideration, the duty of keeping the decedent under surveillance and the suicide was the proximate result of its failure to do so. Whether the sanitarium under all the circumstances had failed to exercise reasonable care was for the jury to determine. We cannot, for the foregoing reasons, hold the conclusions of the jury to be so unreasonable as to call for interference with their verdict and we conclude the trial court was not in error in refusing to set it aside.

There are two assignments of error in the charge which rest primarily upon the same ground as the questions we have already discussed. The court told the jury in effect that failure to provide twenty-four-hour attendance did not itself solve this case, because in order to hold the sanitarium negligent, it was necessary to determine further whether it had knowledge, or was charged with notice of, the decedent's mental condition and his desire for self-destruction, but if it did have notice then they might find its duty required it to maintain the twenty-four-hour attendance unbroken. We see no error in that presentation of the matter.

Another assignment is the failure of the court to correct the finding which in one paragraph says that Mrs. Jaquish told Dr. Adams about the decedent's "mental condition." It is claimed that her testimony does not support this as she used only the word "condition." For reasons already sufficiently indicated, we do not sustain this assignment. It was a fair infer-

ence from the testimony that she referred to his mental rather than his physical condition.

A final assignment is the court's statement to the jury in the charge that it was the duty of the sanitarium to use reasonable care to employ nurses and attendants who possessed that reasonable degree of learning and skill ordinarily possessed by persons similarly engaged. This rule obtains in the case of charitable hospitals. *Hearns* v. *Waterbury Hospital,* and *Cashman* v. *Meriden Hospital, supra.* The obligations of a charitable hospital to its patients are less onerous than those of a private hospital carried on for profit, but we do not consider it necessary to determine whether the foregoing rule applies in the latter case because no claim was made or evidence offered that the present defendant was in any way negligent in this regard. There was no such issue before the jury and no evidence upon which they could have decided such an issue. In any event the defendant could not have been harmed by this portion of the charge.

There is no error.

In this opinion the other judges concurred.