**Evelyn VON EYE, Plaintiff,**
**v.**
**Dr. E. M. HAMMES, Sr., et al. (Mounds Park Hospital), Defendants.**
**Civ. No. 2841.**

United States District Court
D. Minnesota, Third Division.
Aug. 10, 1956.

---

10. Quoted from the Examiner's report.

11. See East Texas Lines v. Frozen Food Express, 351 U.S. 49, 54, 76 S.Ct. 574.

Lawrence O. Larson, Minneapolis, Minn., for plaintiff.

Richard, Janes, Hoke, Montgomery & Cobb, Bergmann Richards and Melvin D. Heckt, Minneapolis, Minn., Alfred R. Sundberg, St. Paul, Minn.; for Mounds Park Hospital.

DONOVAN, District Judge.

This tort action to recover damages for personal injuries sustained by and resulting in disability to plaintiff is now before the Court on alternative motion by defendant Mounds Park Hospital for judgment notwithstanding the verdict returned for plaintiff in the sum of $39,380, or for a new trial.

Seeking to vacate the judgment, defendant contends:

1. The verdict and the judgment entered thereon are contrary to the evidence;

2. The judgment is contrary to law;

3. The trial court erred in certain rulings and instructions.

A verdict was directed by the Court on motion therefor by the defendant doctors. The defendant Mounds Park Hospital was the only remaining defendant, and for convenience the present parties to the instant case will be referred to as plaintiff and defendant.

Discussion of defendant's points made in support of the alternative motion will be in the order above set forth.

*1. Is the verdict and judgment contrary to the evidence?*

 Defendant, urging this point, thereby challenges the weight and sufficiency of the evidence as a basis for the verdict; hence a summarizing of the facts is in order.

At the time it was determined that a neurological examination and diagnosis of plaintiff by competent neurologists was indicated, plaintiff resided with her husband and their three children (five, four and two years of age at trial) on a farm at Miller, South Dakota. She described her condition before hospitalization in this manner:

"I would get depressions. I would cry. * * * I would wander around, not knowing much what I was doing. * * * I had no perspective. * * *. I felt like killing myself. * * * I took the kids away in the truck. I had blackouts. * * * I didn't have them adequately dressed. * * * Well, it was chilly weather, * * *. I put them in the truck and drove for miles. * * * They were crying terrible."

Plaintiff's sister, Frances Rydel, was a registered nurse employed part time at defendant's hospital, in the City of St. Paul, Minnesota. It was decided that plaintiff, accompanied by her mother, would journey to St. Paul to seek her sister's advice. The sister arranged for plaintiff to meet Dr. Hammes, Sr., at defendant's hospital. A history and examination was made by defendant doctors who were specialists in "nervous and mental diseases", on October 12, 1954, and she was assigned (quoting the testimony of Dr. Hammes, Sr.):

"to a room [in] the open ward where we have nervous and mental patients. * * * There is a closed ward where the very disturbed patients are kept. * * * That is what we might call the exclusively psychiatric ward. * * * She [plaintiff] had the same kind of a room that every patient had on the second floor where the window is barred. * * * [I gave orders as to what privileges plaintiff might have] after I reviewed the history * * * and after I had examined her.

* * * * * *

"My diagnosis was a schizophrenia with paranoid tendencies * * *. A schizophrenia is a mental disorder occurring more frequently in young people, which is commonly known to the laity as a split personality. Those patients frequently develop delusions, hallucinations of sight and hearing, and if they manifest persecutory ideas, like this patient had, we call them schizophrenia with paranoid tendencies. Sometimes these patients go into what we call a catatonic stupor, so that they lie in bed and have their eyes closed and are resistive and have to be tube fed and sometimes water has to be drawn, which is just one phase of the schizophrenia.

* * * * * *

"And on the 5th of November I ordered the electric shock treatment —that was the only one that she had—and I said if patient is willing to take it; and also ordered her to sit in the sun parlor an hour in the forenoon and the afternoon because she felt her restrictions, and I thought it would help her to have a little more activity by walking out into the sun parlor and sitting there and visiting with other patients. And an order like that did not mean

that she needed a nurse. She could go out there alone.

\* \* \* \* \* \*

"Deciding whether a patient should go in an open ward or a closed ward, regardless of the type of mental illness they have, depends entirely upon the character of the sick ideas that they have, any manifestation of suicidal tendencies, danger to harm themselves, or disturbances, so that it disturbs other patients, in the other rooms, and reactions of that type. If a schizophrenic has those tendencies, or shows disturbed states, or has to be fed with a tube because they will not eat, those people should be placed in the closed ward. But the average cooperative patient who controls himself well, in my opinion they are safe in the open ward.

\* \* \* \* \* \*

"Q. Why did you not order this plaintiff put in restraints? A. Because there was no need of it.

"Q. And will you give us why you came to that conclusion? A. She—neither in her history as given by her and by her sister was there any evidence of any tendencies that she might harm herself or might harm others. From the day that she came into the hospital she was a cooperative patient. She did what we asked her to do. She had these distressing ideas, which at times dominated her, but never to the point where we felt that there was any danger that she might either harm herself or harm anybody else.

\* \* \* \* \* \*

"Q. So far as you now know from all sources, were all of the orders of you attending physicians, the three of you, carried out by the hospital? A. As far as I know, all the orders that were written by my son and by Dr. Norman and myself were carried out".[1]

The attending physician testified that it was up to the nurses to see that plaintiff did not leave her room.[2] On October 22, 1954, her attending physician testified plaintiff "seemed suspicious. Wants door closed tightly because some one might be listening outside. \* \* \* Deep insulin shock" was prescribed on October 29th and on November 1st the attending physician ordered "no insulin until further orders." By November 5th she appeared hostile.[3] On November 5th Dr. Hammes, Sr., ordered "an elec-

1. Nurse Currier, who attended plaintiff off and on from 8 a. m. to 9:32 a. m. when the cause of the injuries occurred on November 8, 1954, testified:

"[at 9:30 a. m.] I went to the sun parlor and told her that the doctor had ordered her to go back to her room after being up one hour. And she said she had not been up one hour. And I said that it was time for her to go back and would she please go. And she said, 'who is my doctor? You don't even know who he is.' And I said, 'Mrs. Von Eye, it is time for you to go back to your room.' So she got up from her chair and went back to her room. I then followed her and went behind her, and she got to her room. She sat down and picked up a magazine and started to read. I then went about my other tasks.

\* \* \* \* \*

"[And she was injured at about 9:35, about two or three minutes later] \* \*."

2. Dr. Hammes, Sr., describes his initial orders of October 18, 1954, as follows:

"After I reviewed the history with her and after I had examined her I left the following order (referring to plaintiff's exhibit 1) ' \* \* \* Lock closet door', which is a customary rule with patients of this type, because we don't know—if they get restless, they might want their clothes, and when we lock the closet door, they can't get them. And I left an order to have her in bed with no bathroom privileges."

3. Dr. Hammes, Sr., testified regarding plaintiff's attitude, as follows:

"The next time I saw her was on the 5th day of November, when I made the following notation: 'Attitude as above.' And by 'above' I mean the note that Dr. Norman left the day before which reads as follows: 'Very hostile. She wants liberties we won't give. If we don't, she really will go crazy. She has many

tric shock treatment in the morning if patient is willing to take them. * * * May sit in sun parlor one hour in the forenoon and in the afternoon * * * [and] they usually are allowed to go to the bath room."

Dr. Hammes, Sr., and his associates, Dr. Hammes, Jr., and Dr. Norman conferred and discussed plaintiff's case. As part of the standard treatment nurse Frances Rydel was requested not to attend plaintiff on account of her being plaintiff's sister, and in that respect quotes the attending physician as saying:

"We are going to move her as soon as we can possibly get another room on first floor, because we don't like this set-up of having you on the same floor with her. * * * I want you to leave her alone as much as possible. * * * Your sister is a very sick girl."

Plaintiff's sister testified further that she saw her sister around midnight prior to going off duty on November 8th (the date plaintiff jumped out of a window and sustained the injuries herein sued for), and that plaintiff:

"* * * appeared quite upset, but she was quiet. * * * She said there was a parked car outside the window with two men in it and they were watching her. * * * There was no parked car outside the window. * * * I noted that on the chart. [Exhibit No. 1]. * * * [I called Dr. Hammes, Jr., around 4 o'clock in the morning, November 8, 1954] and told him that she hadn't slept all night. * * * she was upset and restless. * * * He said to give her sodium luminal * * *."

Plaintiff's witness Lorraine Glewwe, a patient in defendant's maternity ward on November 8, 1954, describes the events leading to the leap from the window as follows:

"I was sitting in my room, in my bed, reading a book, and I looked up and Mrs. Von Eye was standing at the foot of my bed. And she asked me if I had had a baby, and I told her yes. And she asked me if it was a boy or a girl. And I told her it was a girl but that it had died. And she said that was too bad. And she said—then at that time there were voices in the hall; whether they were the nurses coming from upstairs going downstairs, or whether it was the nurses checking the lights, I do not know. And she went behind the door. She stood behind my door. She started to close it first, and I told her, no, she couldn't close it because they wanted my door half open at all times. She then stood behind the door, and I asked her—and she turned around and went 'shh'. And I asked her why. And she said she had to get out of there, they were trying to hold her there. And then she put a chair under the door, closed the door and put a chair under the door, and went out the window."

There is no dispute about defendant being "a general hospital taking care of medical, surgical, obstetrical, mental and nervous patients * * *."

What the attending physicians did may be summarized by Dr. Hammes, Sr., who on direct examination testified as follows:

"I saw her first on the morning of October 18, 1954, at which time I reviewed the history that she had given to Dr. Norman. I made a physical examination, an examination of her nervous system and examination of her mental status. At that time I made a note saying that

secrets about "two Joan Ellens" but does not care to discuss them.' My notes were: 'Attitude as above. Quite belligerent, fault finding, and so forth. Wants to see her husband. Told her we would write him on Monday.' We always write the relatives on Monday. I told her when we write Monday we would have the husband come up."

the patient is 'depressed, agitated, paranoid.' And by 'paranoid' it means that they have sick ideas of a persecutory nature. That was on the first day that I examined her.

\* \* \* \* \* \*

"But on the 22nd when I saw her again—I usually saw her Mondays, Wednesdays and Fridays; and the 22nd, I take it, was on Friday—and here I make a statement which says: 'Seems suspicious. Wants door closed tightly because some one might be listening outside.' It shows the suspicious ideas that she had.

\* \* \* \* \* \*

"The first day I saw her I prescribed for her some bromide medicine to help her and a mild sedative for sleep, to have the closet door locked, to have her remain in bed, no bathroom privileges, a full diet, no visitors, mail or phone calls, and the usual laboratory work. Then on the 19th the insulin treatments were begun.

\* \* \* \* \* \*

"On the 27th of October she had her first insulin shock, and the dose of insulin was about the average sized dose for her height, or rather for her weight. On the 27th of October she had a deep shock, so she didn't come out of it by the ordinary feeding through the nose with glucose, which is sugar, and in addition to that we had to give her some, the same kind of glucose, in the vein, and then she came out of it. And the dose of insulin was reduced. That insulin treatment was continued until the 1st of November, when she again had a deep shock and again required some injection in the vein with this glucose. As patients are given insulin, sometimes they become sensitive to it and we have to reduce the dose. That is why we have to watch the treatments very carefully every day. I saw her shortly after I had given this glucose intravenously on the first of November.

\* \* \* \* \* \*

"That day [November 5th] I also made a statement that: Electric shock treatment this A.M., or in the A.M., 'if patient is willing to take them. May sit in the sun parlor 1 hr.' in the forenoon and in the afternoon. And I say: Continue or give the bromide medication 'after dinner and supper today' and three times after meals. The fifth was on Friday. I did not get to the hospital on Saturday or Sunday and this accident occurred Monday morning, on November 8th, before I made my rounds on the second floor, where she was."

The foregoing is a factual vizualization of the events leading to the unfortunate result involving plaintiff and defendant herein.

There is no dispute relative to the injuries sustained and as described in plaintiff's case.

Emphasizing the contention of insufficiency of the evidence, defendant argues in effect that the orders and conduct of the attending physicians insulate the hospital against liability. In the light of the quoted testimony of defendant doctors and defendant hospital's employees, can the last-named defendant successfully claim immunity from the application of the doctrine of "reasonable care"?[4]

4. The Court instructed the jury on reasonable care, saying:

"You are instructed that a hospital is not an insurer of the safety of its patients. It does not guarantee or warrant that no harm will befall them. A hospital must exercise such reasonable care for the protection and well-being of its patients as his or her known condition, or the condition which, in the exercise of reasonable care on its part, it should have known, may require.

\* \* \* \* \*

"In passing upon the question as to whether or not the hospital was negligent in its care of plaintiff, you are instructed to judge the conduct of the hospital by reference to the facts and cir-

Do the observations and notes made of plaintiff patient by defendant's hospital personnel constitute knowledge of the approach of what the medical witnesses termed an "irresistible impulse" that catapulted plaintiff through the hospital window?

The fact that plaintiff's attending physicians at no time notified defendant hospital that plaintiff had tendencies to injure herself or that the hospital personnel had no knowledge of such tendencies, requires no direction of a verdict for the hospital, in the face of the notes recorded by the attending nurses of delusions and the imagined torture, indicative of the urge of the patient to escape or harm herself. Granted constant nursing attention was not ordered by plaintiff's doctors; nonetheless, in the face of the known facts, there was reason for the nurses who noted in plaintiff the urge to escape to anticipate the contemplated attempt to leave the hospital by violent means. One need not be learned in medicine or the calling of a registered nurse to realize that "a schizophrenic * * * [with] manifest persecutory

ideas like this patient had" and as testified by Dr. Hammes, Sr., could seriously harm herself or others if reasonable care were not taken to prevent her from so doing. This in no way involves diagnosis and treatment consisting in part that the patient be free from restraints. The instant case, however, was one where the ordinary prudent person under like circumstances should at least be bound by constructive notice of the approach of the "irresistible impulse" in the absence of the "catatonic stupor", both of which the plaintiff schizophrenic was subject to.

Defendant argues that, being a general hospital subject to orders of plaintiff's attending physicians, and no orders having been issued for twenty-four hour nursing service, guard or restraint, the responsibility for what happened was the defendant doctors' alone, and the result something unforeseen by the hospital.

Following a recitation of the contentions of the parties, the Court charged the jury on cause and effect.[5]

---

cumstances then in existence, which were known, or which ought to have been known, to the hospital in the exercise of reasonable care, and not by reference to knowledge acquired subsequently or after the accident or by reference to the fact that plaintiff injured herself. * * *."

5. The Court instructed the jury on this feature of the case as follows:
"Plaintiff alleges in her complaint that the defendant knew, or in the exercise of reasonable care should have known, that plaintiff was not in possession of her mental faculties, was mentally deranged and unable to care for herself or protect herself from her own acts, and was at times bereft of reason, and had expressed herself that she was being held prisoner and wanted to escape.
"She further alleges and claims that defendant carelessly and negligently failed to provide proper and necessary safeguards and restraints, or adequate and trained personnel to care for her, and as a result of said acts of omission and commission the plaintiff, on November 8, 1954, fell through or jumped through a window, causing her serious, painful, dis-

abling and lasting injuries, such as outlined by the doctors.
* * * * *
"A person may meet with an accident and sustain injury therefrom when no one is at fault, or it may happen that the person injured in some manner or other contributed to the situation. In this case there is no claim upon the part of the defendant that the plaintiff was guilty of contributory negligence. It may be that some third party was solely to blame. The defendant is not liable unless the accident was proximately caused by its negligence, and is not liable even then if it be found that the injury was caused by some situation over which the defendant had no control.
"Negligence is the basis of this action. What is negligence? Negligence may be defined as the failure to exercise such care as a person of ordinary prudence would usually exercise under the same or similar circumstances. That is the standard you must apply in this case. It means the doing of something that a person of ordinary prudence would not do under the same or similar circumstances. Whether a person has used ordinary care

In my opinion the evidence of the instant case is such that it gives rise to fact questions as to whether the conduct of defendant hospital's personnel was such as to amount to negligence and whether, in the exercise of ordinary care, movant could have anticipated what was liable to happen and cause injury to plaintiff. If cause and effect proximately resulted from such negligence, the jury issue was established. Substantial evidence supports the verdict.[6]

In Leonard v. Watsonville Community Hospital, Cal.App., supra [6], the Court, in a malpractice case against a defendant hospital, among other things held that evidence elicited from an adverse witness is not binding on the plaintiff, and calling one does not overcome the inference on which plaintiff relies. Further, that where malpractice is asserted against the hospital, the rule requiring expert testimony to prove lack of due care is the same as that required in a case where a physician is sued for malpractice. However, the significant holding of the California court followed, the Court saying [291 P.2d 500]:

"While proof of [malpractice] is customarily made by testimony of experts * * * the facts of each case must be judged according to their own merits. If the alleged neglect relates to matters of conduct

[as in the instant case] which are reasonably within the ken of the average layman, the jury may determine the culpability of the person charged therewith without the aid of experts."

Another case cited by movant is South Highlands Infirmary v. Galloway (Alabama), supra [6], where the Court holds the rule to be that in a negligence case against a hospital for injury to a patient inmate, the hospital is liable for want of ordinary care. Further, that the problem of safety, for a nurse to leave the patient alone for a short time, is a jury question.

Examination and close scrutiny of the cases relied on by defendant in the instant case make clear that they are not in point as supporting movant's motion herein.

*2. Is defendant hospital entitled to judgment against plaintiff as a matter of law?*

■ This being a diversity case, the substantive law, as declared by the Supreme Court of Minnesota is controlling, and must be applied to the facts of the instant case.[7]

Plaintiff was attended daily by defendant's nurses, who not only had access to, but were actually in possession of the hospital record, and to which was added

is to be determined in the light of the surrounding circumstances.

"The defendant hospital in this case, although it is not an insurer of the safety of the patient Evelyn Von Eye, must exercise such reasonable care for the protection and well-being of the patient as her known physical and mental condition requires or is required by her condition as it ought to be known to the defendant hospital in the exercise of ordinary care. "Any knowledge acquired by any of the nurses of the defendant hospital in the course and scope of their employment or which by the exercise of ordinary care they should have acquired after Evelyn Von Eye was received as a patient and before her injury, imposed upon the defendant hospital the duty of using reasonable means within the limits of its authority and the nurses' authority to prevent her from committing any actions

which would bring injury upon herself when she was in a mentally distressed condition.

"Where there is liability or any injury proximately resulting from negligent conduct, it is immaterial that defendant could not have anticipated the particular injury which did occur. * * *"

6. In support of movant's claim of freedom from negligence, counsel cites: Mesedahl v. St. Luke's Hospital Ass'n of Duluth, 194 Minn. 198, 259 N.W. 819 (but see Sylvester v. Northwestern Hospital of Minneapolis, footnote 9, infra); 41 C.J.S., Hospitals, § 8(3) p. 349; Leonard v. Watsonville Community Hospital, Cal. App., 291 P.2d 496; South Highlands Infirmary v. Galloway, 233 Ala. 276, 171 So. 250.

7. Erie Railroad Company v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.

their personal observations which included the irrational conduct of plaintiff.

Does Minnesota law, on the record herein made, charge defendant hospital with knowledge thus obtained by its trained personnel and written into the hospital record by them and the attending doctors?[8] Did the knowledge thus obtained charge defendant with knowing the possibility of plaintiff's meeting personal injury by what her attending physicians term an "irresistible impulse"? The answer must be in the affirmative. The facts of the instant case require "reasonable care to prevent" harm to the patient. In other words, if the conduct or conversation of the patient "are such that a reasonably prudent person should have under the circumstances anticipated an inclination on the part of the patient to escape [or harm herself], care should have been exercised to prevent such act."

■■ Minnesota law is to the effect that a private hospital (such as defendant's), although it is not an insurer of the safety of a patient (such as plaintiff), must nevertheless exercise such reasonable care for the protection and well-being of plaintiff-patient as her known physical and mental condition requires, or as is required by her condition as it ought to be known to the hospital in the exercise of ordinary care, and such care must always be exercised in proportion to the patient's ability to look after her own safety.[9] The duty of care imposed on a hospital extends to safeguarding the patient from dangers due to mental incapacity.[10] That defendant could not

have anticipated the injury that did happen does not help defendant.[11]

■■ Few cases are identical when their facts are compared. The negligence or lack of negligence on the part of defendant depends on the facts of the instant case. The distinction between the propensities or idiosyncrasies, or the unpredictable behavior of an intoxicated person[12] or a schizophrenic such as plaintiff in the instant case, is a relative matter. Each may well be a source of danger to self or others. This is a matter of common knowledge. The knowledge in possession of the nurses, as disclosed by the evidence, was knowledge of defendant hospital, and neglect by such hospital personnel is neglect of the hospital, under the doctrine of respondeat superior.[13] To illustrate, if plaintiff had attacked the bedridden woman patient whom she last visited and conversed with prior to the damaging leap from the window, the propelling "irresistible impulse" of plaintiff could not be distinguished from impulses spurred on in the person who over-indulged, in Sylvester v. Northwestern Hospital, etc., supra, cited in footnote 9.

■ The evidence and law governing the instant case required the Court to submit to the jury the fact questions as to whether defendant exercised ordinary care, and if it did not, then whether defendant's failure to exercise ordinary care, under all the circumstances, was the proximate cause of the injuries sustained by plaintiff. This is true, notwithstanding claimed insulation against negligence because of doctors' orders.[14]

8. Defendant contends that the matter of determining privileges allowed the patient was the sole responsibility of the attending physicians, not the hospital.

9. Sylvester v. Northwestern Hospital of Minneapolis, 236 Minn. 384, 53 N.W.2d 17, 19.

10. 41 C.J.S., Hospitals, § 8, p. 349, supra.

11. Justice Mitchell so ruled in Christianson v. Chicago, St. P. M. & O. Ry. Co., 67 Minn. 94, 69 N.W. 640, 641.

12. Such as involved in the Sylvester case, supra.

13. See Mulliner v. Evangelischer Diaskonniessenverein, etc., 144 Minn. 392, 175 N.W. 699; Borwege v. City of Owatonna, 190 Minn. 394, 251 N.W. 915; St. Paul-Mercury Indemnity Co. v. St. Joseph's Hospital, 212 Minn. 558, 4 N.W.2d 637.

14. See Hignite's Adm'x v. Louisville Neuropathic Sanatarium, 223 Ky. 497, 4 S.W. 2d 407; Rural Education Ass'n v. Anderson, 37 Tenn.App. 209, 261 S.W.2d 151; Wetzel v. Omaha Maternity & General Hospital Ass'n, 96 Neb. 636, 148 N.W. 582.

Defendant concedes absence of contributory negligence in plaintiff. The jury was instructed as requested by defendant with reference to all phases of the case chargeable to the attending physicians, except where such requests would be inconsistent with the Court's charge on negligence and proximate cause. To do otherwise would frustrate and confuse the jury.[15] What the Court did may be epitomized in this quotation from the Court's instructions to the triers of the facts of the case:

> "You are instructed that the defendant hospital cannot be charged with any negligence on the part of the attending physicians, Dr. Hammes, Sr., Dr. Hammes, Jr., and Dr. Norman; rather the hospital can only be liable to plaintiff for damages proximately resulting from the negligence of its nurses acting within the scope of their employment."

This case is based on the alleged negligence of the hospital, only. The attending physicians were not called as witnesses for plaintiff. Their cross examination under the rules was conducted by plaintiff in the defendant doctors' character as adverse parties. The statutory protection of the patient would amount to an absurdity if defendant hospital were permitted to circumvent it by calling plaintiff's attending doctors under the guise of experts for defendant.[16]

The verdict is consistent with the substantive law of Minnesota.

The next point urged by defendant is error by the Court.

*3. Was the defendant prejudiced by rulings of the trial court?*

Defendant seeks a new trial for claimed error. Assigned errors I and II are fully discussed and disposed of, supra. III, IV and V are adequately included in the Court's charge to the jury. VI to XII have to do with statutory privilege.[17]

---

15. See Chicago, Rock Island and Pacific Railroad Company v. Emery, 8 Cir., 233 F.2d 848.

16. Contending plaintiff waived her statutory privilege, counsel cites: Doll v. Scandrett, 201 Minn. 319, 276 N.W. 281; Maas v. Laursen, 219 Minn. 461, 18 N.W. 2d 233, 158 A.L.R. 215; and Wigmore on Evidence.
The Doll and Maas cases are obviously different in their facts from the facts of the instant case. The reasoning of Wigmore has been consistently rejected by the Minnesota court from early times, a good illustration of which is to be found in Marfia v. Great Northern Ry. Co., 124 Minn. 466, at pages 469 and 470, 145 N.W. 385, at page 387, where the Court refuses to accept the learned professor's thesis in these words:
"In support of its proposition as to waiver defendant relies largely upon Wigmore on Evidence. This erudite author discusses the underlying principles which govern such matters, and, in his usual trenchant style, asserts that the law ought to be substantially as contended for by defendant, but frankly admits that such is not the law at the present time. We give much weight to his masterly work, but must apply the law as we find it and leave the modification of the statute to the lawmaking power. As said in Hilary v. Minneapolis St. Ry. Co.,

supra [104 Minn. 432, 116 N.W. 933]:
" 'Mr. Wigmore gives some excellent reasons why the statute might be modified. Wigmore, Ev. §§ 2380–2389. But the statute has been of long standing, has generally been liberally construed, and, although there seem to be strong reasons why it might be modified, so as to permit physicians to testify upon such occasions as this, the wisdom of making a change should be left to the Legislature.' "

17. 38 Minnesota Statutes Annotated § 595.02 reads:
"595.02 Competency of witnesses
 * * * * *
"(4) A licensed physician or surgeon shall not, without the consent of his patient, be allowed to disclose any information or any opinion based thereon which he acquired in attending the patient in a professional capacity, * * * and no oral or written waiver of the privilege hereinbefore created shall have any binding force or effect except that the same be made upon the trial or examination where the evidence is offered or received;
* * *."
See also Ostrowski v. Mockridge, 242 Minn. 265, 65 N.W.2d 185, 47 A.L.R.2d 733; First Trust Co. of St. Paul v. Kansas City Life Ins. Co., 8 Cir., 79 F.2d 48, 52.

It is important to bear in mind that this was an action against each and all of plaintiff's attending physicians for alleged malpractice, and against their co-defendant, the hospital, for negligent conduct proximately causing plaintiff's injuries. The three defendant attending physicians had been called for cross examination under the Rules by plaintiff and examined as to consultation by and examination of plaintiff, diagnosis and treatment, and similar matters. No expert opinions were called for in such cross examination.

The record discloses that when defendant hospital indicated to the Court that the attending physicians were to qualify as experts for and on behalf of the hospital, a conference was had at the bench between Court and counsel. The Court inquired of able counsel if they proposed calling additional experts and was advised that three experts were to follow, which would make a total of six medical experts in defendant hospital's case. No experts had been called in plaintiff's case. With three well-qualified experts other than the attending physicians proposed to be called as witnesses for defendant, any additional experts were opposed by the letter and spirit of the Federal Rules of Civil Procedure.[18]

■ Limitation of the number of experts permitted to be called was a matter resting in the discretion of the trial court. The power of the Court to limit the number of experts aside, the use of plaintiff's attending physicians in the guise of experts would divest their patient of the privilege extended plaintiff by statutory law of Minnesota. To permit attending physicians to testify as contended for would be but an end to the means of commercializing knowledge thus obtained, and destroy the intent of the legislative branch of the State. There is nothing in the record that can be spelled into waiver of that privilege by plaintiff.[19] The defendant doctors were eliminated as parties long prior to their being tendered as expert witnesses for defendant hospital. No longer was the propriety of their treatment of plaintiff questioned. Cross examination under the Rules, while they were defendants, did not constitute waiver within the meaning of the controlling statute.

I am satisfied the verdict of the jury is sustained by substantial evidence; that defendant hospital was not entitled to a directed verdict as a matter of law, and that the record is devoid of prejudicial error.

For the foregoing reasons defendant's alternative motion for judgment or a new trial must be denied.

---

18. Rule 16(4), 28 U.S.C.A.—The limitation of the number of expert witnesses. Whether "pre-trial" or "intra-trial", the principle is the same.

19. Ostrowski v. Mockridge, supra.