# WALTER G. QUICK v. BENEDICTINE SISTERS HOSPITAL ASSOCIATION, d.b.a. ST. MARY'S HOSPITAL.

102 N. W. (2d) 36.

March 25, 1960—No. 37,828.

*Victor H. Gran* and *Mahoney & Mahoney,* for appellant.
*Dancer, Montague, Applequist, Lyons, Nolan & Nordine,* for respondent.

NELSON, JUSTICE.

Walter G. Quick commenced an action against Benedictine Sisters Hospital Association, a corporation, d.b.a. St. Mary's Hospital, which owns and operates St. Mary's Hospital in the city of Duluth. It specializes in the care of patients suffering from mental and nervous disorders. Between October 3 and October 25, 1955, plaintiff was a patient in said hospital for treatment of a marked paranoid condition. During this time he was given a series of electroconvulsive shock treatments.

Plaintiff alleged that defendant was guilty of negligence in the care afforded him because its employees failed to provide adequate and necessary safeguards for his protection; that as a result he fell from the hospital bed to the floor and suffered a fracture of the right shoulder for which he sought damages.

Defendant denied that it was negligent and alleged that any injuries sustained by plaintiff while a patient resulted from his own carelessness and negligence.

Defendant moved for a directed verdict at the close of plaintiff's testimony on the ground that the evidence failed as a matter of law to establish any negligence on the part of defendant proximately contributing to the alleged injury. Defendant did not urge plaintiff's contributory negligence as a ground for its motion. The court granted de-

472

fendant's motion and plaintiff appeals from the judgment entered.

In considering the propriety of a directed verdict this court must treat the evidence in favor of the party against whom such verdict has been directed as proving every material fact which it either proves directly or by reasonable inference. Viewing the evidence in that light in the instant case, the following may be related as material facts:

Plaintiff received his special treatments at St. Mary's Hospital from Dr. George M. Cowan, his own doctor who was then a member of the hospital staff specializing in the field of psychiatry and neurology. Plaintiff was given a series of electric shock treatments as part of the treatment prescribed for his mental illness. Prior to each electric shock treatment, he was administered sodium amytal which has a sedative effect, usually inducing sleep. In each shock treatment a small current of electricity is sent through the brain for 3/10 or 4/10 of a second. This is done by placing two metal electrodes about the size of a silver dollar on each side of the patient's head and securing them with a rubber band. A wire leads from each electrode to the apparatus that gives the shock itself. The apparatus has dials for setting the voltage and time. The immediate effect of the treatment is to cause unconsciousness and a convulsion involving the entire body.

The type of treatments given plaintiff by Dr. Cowan is known as grand mal treatments and results in a jerking or shaking of the various muscles of the body immediately following the application. The body becomes temporarily arched, ultimately relaxing; the convulsion itself lasts from 5 to 10 seconds. Thereafter the patient usually sleeps for varying periods of time. Each treatment given plaintiff caused a grand mal convulsion and on each occasion he became unconscious. Dr. Cowan testified that on such occasions it must be ascertained if the patient's general condition after treatment is good; he must be placed in a comfortable position, usually on one side; and the side rails on the bed must be raised. One of the nursing personnel stays with patient until it is certain that his breathing and circulation are good and that he does not go into a state of collapse. Dr. Cowan further testified that the patient remains unconscious for some period

after the treatment and that such periods are lengthened by reason of the use of sodium amytal; that the patient is customarily confused following the treatment, this confused condition varying with the individual patient but often increasing in degree and duration with successive treatments. He also stated that the patient at times becomes unaware of his surroundings.

Dr. Cowan also testified that he does not himself assign the nurses to watch over the patient after treatment has been given; that this is up to the head nurse or her assistant at the hospital. He gives the treatments in the patient's room with the assistance of nurses or nurses' aides, who are employees of the hospital. The doctor made it clear that such employees are not working for him; that he is not working for the hospital; and that after he leaves the patient the care of the patient is the function of the hospital; and that the necessary care is furnished by the hospital nurses and attendants. Dr. Cowan said that after treatment occasionally he comes back for a look at his patient but that one of the nurses, or a nurses' aide, would be left in attendance, this being the standard practice of the hospital. When asked if he gave any instructions as to how long the nurses were to remain with the patient just treated, he answered: "I feel that is the job of the nursing personnel."

Dr. Cowan said that the purpose of the presence of the nurses or their aides was to make sure that the patient's general condition is good and to make sure that nothing unusual develops. Quite commonly the patient awakens in a confused state. The doctor's testimony further indicates that, where several grand mal treatments have been administered, there follows a period of partial and temporary amnesia or a difficulty with memory and at times a period of confusion; that the patient becomes unconscious from the shock administered, undergoes a convulsion, and when he becomes conscious he will continue confused and be unsteady on his feet should he get out of bed; that it is not uncommon for a patient to seem dazed from 2 to 3 hours after the treatment; *that such condition may affect his orientation for 3 or 4 hours after treatment and the patient may be confused as to where he is even though he might be able to carry on a conversation*

*and answer when spoken to.* The doctor further said he does not remember if he put up bed rails on plaintiff's bed but stated that he very often did. When asked if he knew whether anyone was left with plaintiff the day he was injured, his answer was that someone is always left with the patient but that *he does not remember who was left with the patient, or if anyone was left with him.*

On cross-examination Dr. Cowan said in effect that a patient has no control over convulsions such as the plaintiff experienced; that they cause contractions of the muscles; and that there are occasions when this muscle contraction may produce bone fractures. He said that while it is not necessary that a patient receiving shock treatments be kept under constant observation, it is necessary and advisable from a medical standpoint that following an electric shock treatment someone attend or observe the patient until his respiration and pulse return to normal. He further testified that there was no evidence of plaintiff's suffering the fracture during the course of any of the treatments.

Margaret Merkes testified that she was the psychiatric head nurse on October 13, 14, and 15 when plaintiff received shock treatments; that she learned about the accident on October 13 by questioning plaintiff after she heard him say something to one of the other patients; and that she then notified an interne of the accident. She further stated that she was usually present when plaintiff received his grand mal treatment; that he had a grand mal seizure and went to sleep. She also said that some patients will be up within an hour, even when sodium amytal is used, others will sleep on for a while; that the hospital always leaves an attendant with the patient following a treatment of this type. She did not recall who was left with plaintiff at this time. The witness further testified as follows:

"Q. 'Who would be left as attendant with Mr. Quick after the treatment?'

"A. 'It could be a graduate or a student nurse, an aide, or psychiatric aide.'

\* \* \* \* \*

"Q. 'You can't remember the name of the attendant who was

left in charge?'

"A. 'I am sorry. I don't.'

\* \* \* \* \*

"Q. 'Do you remember pulling the rails up on October 13th, 1955?'

"A. 'I don't remember if I helped with that treatment.'

"Q. 'Do you know anyone who helped with the treatment?'

"A. 'I am sorry. I don't know.'

\* \* \* \* \*

"Q. 'Were you present when the interne examined Mr. Quick?'

"A. 'I don't remember. I imagine I went with him; usually I do.'

"Q. 'When was the first X-ray taken of Mr. Quick's arm? Can you tell us that?"

"A. 'On the 15th.'

"Q. 'Two days later?'

"A. 'Yes.'

"Q. 'What treatment was rendered to Mr. Quick on the 13th?'

"A. '13th?'

"Q. 'What treatment was rendered to his shoulder?'

"A. 'Hot water bottle to his right arm.'

"Q. 'What treatment was rendered on the 14th?'

"A. 'I don't know; nothing on the chart.'

"Q. 'What treatment was given to Mr. Quick on the 14th for the condition in the shoulder?'

"A. 'I see by the notes that oil of wintergreen was applied to the right shoulder.' "

The hospital record discloses an entry made October 13, 1955, stating that at 12:15 patient came out to chart desk stating that he climbed over side rails and fell, hurting his right shoulder; that an interne was called and Dr. McRae visited patient at 2 o'clock; that he was resting in bed, some discomfort in shoulder. Another sheet of the hospital record, signed by J. J. Asta, M. D., states (sheet dated 10-15-55):

"Request of Examination    X ray right shoulder.

"Essential Clinical Data hosp. accident fell out of bed following Est.

"1 film LB."

(We assume that Est. indicates electric shock treatment.)

Other entries indicate that the shoulder remained sore; that oil of wintergreen was applied; and finally a cast. One of the entries indicates Dr. Cowan having an order sent to X-ray that patient complains of severe pain in right shoulder. There appears, however, to be a direct conflict in the testimony as to whether the injury to his shoulder resulting in the fracture occurred on October 13 or on October 15.

The deposition of Joan Wilson, assistant head nurse, on duty from October 13 to October 27, 1955, is in evidence, and certain portions of her testimony are as follows:

"Q. 'Do you remember at this time what the patient told you, where he told it to you, and in whose presence you and he were?' [Plaintiff himself brought his injury to the attention of the hospital.]

"A. 'I don't recall if there was anyone else around at the time.'

"Q. 'Do you remember what he told you?'

"A. 'Not specifically, no.'

"Q. 'At the time that he told it to you, what did you first do?'

"A. 'I mentioned it to someone else. I don't know. They said that they would call an interne. They started to take care of it.'

"Q. 'What did you do?'

"A. 'I don't remember.'

\* \* \* \* \*

"Q. 'Who stayed with him [Mr. Quick] on this morning?'

"A. 'I don't know.'

"Q. 'Restrained or tied down in any manner?'

"A. 'No.'

"Q. 'Any protective devices?'

"A. 'Side rails.'

"Q. 'Who put them up?'

"A. 'I don't know.'

"Q. 'Were they put up?'

"A.   'They are put up.'
"Q.   'Do you know that for a fact?'
"A.   'We always do that.'
"Q.   'Were you there on this occasion?'
"A.   'I don't remember if I was there or not.'
"Q.   'Do you remember how long it would be following a treatment which Mr. Quick was given sodium amytal that he would recover and be awake?'
"A.   'I don't remember.'
"Q.   'Do you remember anything concerning his condition following the treatment, say, within two hours after treatment?'
"A.   'No, I don't.' "

The deposition of Mary Jane Baker was read to the jury. She was a nurses' aide who normally stayed with patients after shock treatment. Her testimony was in part as follows:

"Q.   'Do you have any recollection of the side rails being up on Mr. Quick's bed?'
"A.   'I don't remember Mr. Quick.' "

The testimony of the hospital employees follows pretty much this pattern. Perhaps due to the large size of the hospital and its numerous patients, there were many answers of "I don't know," "I don't remember," and "I don't recall."

The plaintiff on cross-examination testified:

"Q.   And do you remember it being a single bed?
"A.   Yes, it was a single bed.
"Q.   And do you remember it had sides on it that could be put up?
"A.   That is one thing I don't remember.
"Q.   You don't remember?
"A.   No. If there was any sides, it was always down."

Valerie Quick, plaintiff's wife, visited him each evening during his stay at the hospital. She testified that on the evening of October 13 she detected a smell of oil of wintergreen; that his mind was rather hazy that evening; that she didn't notice anything different on the next night;

and that she made no inquiry of the nurses although the use of oil of wintergreen was again noticeable. She testified as follows in regard to her visit on the evening of October 15:

"Q. Mrs. Quick, again calling your attention to about the evening of October 15th, the time a person dressed in—was it a woman dressed in nurse's clothes—came in to take Mr. Quick's temperature?

"A. Yes, sir.

"Q. Is that correct? And at that time did that person tell you something concerning Mr. Quick?

"A. She told me he had an accident.

"Q. I am now referring, so we understand it, to this person who was in the nurse's uniform.

"A. She came in and told me that he had a slight accident that morning.

"Q. And what had happened?

"A. She said he had fell out of bed.

"Q. At what time?

"A. Right after he had a treatment.

"Q. Did she tell you what date the accident happened?

"A. It happened on a Friday morning.

"Q. Are you sure of the date?

"A. Well, Wednesday, I remember, was the 13th; so that would be the 15th of October.

"Q. Did she tell you he had fallen on the 15th or on the 13th?

"A. On the 15th.

"Q. That is the only notice you received from the hospital that he had been hurt?

"A. That is all.

"Q. And they told you that that happened after—

"A. After a treatment.

"Q. I see. Did you have any information from any other person concerning this?

"A. No, not until after they had put his arm into a sling—"

Within a matter of days, plaintiff's arm was placed in a cast.

■ It is a well-recognized rule that a patient entering a hospital operated for the treatment and cure of mental and nervous disorders, for private gain is admitted under an implied obligation that the hospital will exercise such care and attention for his safety as his mental and physical condition, if known, may require. The degree of care and attention must be in proportion to the physical and mental ailments of the patient, and the question whether such requirements have been met, generally, presents an issue to be determined by the jury.[1] The general principle that a master is responsible for the torts of a servant in the scope of his employment applies to such hospitals incorporated and conducted for private gain.[2]

Plaintiff here was attended daily by defendant's nurses and nurses' aides, who not only had access to the hospital record but also had their personal observations of plaintiff's conduct, irrational and otherwise. Certainly defendant hospital is charged with knowledge thus obtained by its trained personnel and written into the hospital record by them and by the doctor and internes attending the plaintiff. The defendant,

[1]See, Durfee v. Dorr, 123 Ark. 542, 186 S. W. 62; Wood v. Samaritan Institution, 26 Cal. (2d) 847, 161 P. (2d) 556; Hawthorne v. Blythewood, Inc. 118 Conn. 617, 174 A. 81; Adams v. Ricks, 91 Ga. App. 494, 86 S. E. (2d) 329; Fowler v. Norways Sanatorium, 112 Ind. App. 347, 42 N. E. (2d) 415; Lexington Hospital v. White (Ky.) 245 S. W. (2d) 927; Paulen v. Shinnick, 291 Mich. 288, 289 N. W. 162; Maxie v. Laurel General Hospital, 130 Miss. 246, 93 So. 817; Wetzel v. Omaha Maternity & General Hospital Assn. 96 Neb. 636, 148 N. W. 582, Ann. Cas. 1915B, 1224; Duke Sanitarium v. Hearn, 159 Okl. 1, 13 P. (2d) 183; Hamilton v. Corvallis General Hospital Assn. 146 Ore. 168, 30 P. (2d) 9; Sloan v. Edgewood Sanatorium, Inc. 225 S. C. 1, 80 S. E. (2d) 348; James v. Turner, 184 Tenn. 563, 201 S. W. (2d) 691; Hogan v. Hospital Co. 63 W. Va. 84, 59 S. E. 943; Annotations, 124 A. L. R. 195 and 37 A. L. R. (2d) 1290, Hayt, Hayt & Groeschel, Law of Hospital, Physician, and Patient (2 ed.) pp. 204, 205.

[2]Fowler v. Norways Sanatorium, *supra;* Maxie v. Laurel General Hospital, *supra;* Gilstrap v. Osteopathic Sanatorium Co. 224 Mo. App. 798, 24 S. W. (2d) 249; Wetzel v. Omaha Maternity & General Hospital Assn. *supra;* Fawcett v. Ryder, 23 N. D. 20, 135 N. W. 800; Hogan v. Hospital Co. *supra;* Prosser, Torts (2 ed.) § 63.

therefore, was charged with knowing the probability that plaintiff, due to his confused state of mind, might cause harm or injury to himself.

The decisions of this state clearly indicate that a private hospital, although it is not an insurer of the safety of a patient, must exercise such reasonable care for the protection and well-being of the patient as his known physical and mental condition requires or as is required by his condition as it ought to be known to the hospital in the exercise of ordinary care.[3] The duty imposed on the hospital in the instant case extends to safeguarding the patient from dangers due to the patient's physical and mental incapacity as indicated upon his entry and as could thereafter reasonably be anticipated in his case due to the progressive deteriorating effect resulting from the repeated shock treatments.

■ The mere fact that the defendant did not anticipate the injury that did happen does not relieve the defendant. If the act is one which the hospital, in the exercise of ordinary care, ought to have anticipated was liable to result in injury to the patient, then the hospital would be liable for any injury proximately resulting from it although the hospital could not have anticipated the particular injury which did happen. Von Eye v. Hammes (D. Minn.) 147 F. Supp. 174.[4]

■ The negligence or lack of negligence on the part of the defendant would depend upon the particular facts. The knowledge in possession of the nurses and attendants of the hospital as disclosed by the evidence was knowledge of the defendant, and neglect by such hospital personnel would be neglect of the hospital under the doctrine of respondeat superior.

■ We think the evidence and the law governing the case at bar required the trial court to submit to the jury the question whether defendant exercised ordinary care, that is, adequate care under all the circumstances, for the patient's protection; and if it did not, whether defendant's failure to exercise such care was the proximate cause of

---

[3]See, Sylvester v. Northwestern Hospital, 236 Minn. 384, 53 N. W. (2d) 17.

[4]See, Christianson v. Chicago, St. P. M. & O. Ry. Co. 67 Minn. 94, 69 N. W. 640.

the injuries sustained by the plaintiff. This is true, notwithstanding the court in the direction of the verdict indicated insulation against liability because a physician chosen by the patient had administered the technical application of the treatments. This case is based on the alleged negligence of the hospital, only. A mere reading of Dr. Cowan's testimony as to his responsibilities and those of the hospital itself, the nurses, and attendants would clearly rule out such insulation. In the discharge of such duties, physicians and nurses must act with reasonable care and diligence and that means reasonable care to safeguard the plaintiff against known danger or danger which could reasonably be anticipated due to the paranoid condition from which plaintiff was suffering. While the care must be adequate to the known condition of the patient, the hospital will not be liable for failing to forestall unpredictable conduct on the patient's part.

The trial court in directing the verdict at the end of plaintiff's testimony appears to have relied wholly upon Mesedahl v. St. Luke's Hospital Assn. 194 Minn. 198, 259 N. W. 819. The defendant in that case was a general hospital operated and maintained for the care and treatment of medical, surgical, obstetrical, and pediatric cases. It did not take upon itself the curing of any disease, mental or otherwise, either by medicinal treatment or by surgical operation. In coming to its conclusion to reverse, this court said (194 Minn. 208, 259 N. W. 823):

"*Many cases cited by respondent involve hospitals specializing in and equipped for the treatment of mental cases and are not helpful. As before indicated, a different rule applies.* Other cases cited are clearly distinguishable upon the facts." (Italics supplied.)

This court stated in the Mesedahl case that a hospital operated and maintained for the purpose of treating and curing diseases, both physical and mental, having its own staff of doctors and specialists for that purpose, would probably have been under a duty to ascertain all it could to learn about the patient's previous history, such rule being especially applicable with regard to hospitals specializing in the cure of mental disorders, but that such a requirement was too harsh for a general hospital. See, Annotation, 124 A. L. R. 196.

In Mulliner v. Evangelischer Diakonniessenverein. 144 Minn. 392, 394, 175 N. W. 699, where a patient had become violent and got out of bed, this court said:

"The nurse in charge testified that she felt that deceased needed watching; that he was in a dangerous condition where he might commit injury to himself; that if she had had more help she would have thought it proper to watch him closer, and that the only reason she did not watch him closer was that she had so much work that she would not do so. This evidence is sufficient to sustain a finding that defendant was negligent in failing to provide a sufficient number of attendants, and that the attendants were negligent in failing to exercise proper care for the patient's safety."

It was held in that case that when a patient enters a hospital maintained for the profit of the owners, knowing that the number of nurses is less than the number of patients, he may not expect constant attendance, but the patient is entitled to such reasonable attention as his safety may require. The court further said that, if the patient is temporarily bereft of reason and is known by the hospital authorities to be in danger of self-destruction, the authorities are in duty bound to use reasonable care to prevent such an act.

Mr. Justice Matson in Swigerd v. City of Ortonville, 246 Minn. 339, 343, 75 N. W. (2d) 217, 220, reexamined the Mulliner and Mesedahl cases and others and commented upon the duties of a hospital, its nurses, and attendants in the care of a patient as follows:

"Whether the assignment by the hospital of one of its nurses to the care of a patient involves a surrender of control to the attending physician so that the hospital ceases to be responsible for the negligent acts of the nurse can best be ascertained in the light of the recognized function of a modern hospital and the generally accepted limitations on a physician's time. A physician can spend only a short time at the bedside of each patient and he must therefore leave the actual fulfillment of his prescribed treatment to others less skilled. If this were not the accepted practice, no person of moderate means could afford to employ either a specialist or a general practitioner. A patient enters a hospital

in reliance upon the reasonable assumption that its trained staff of nurses, its responsible supervision, and its special equipment will insure him a higher standard of care in administering to his needs as his physician may prescribe. If this assumption were not justifiable, the patient might just as well stay at home during his illness. Clearly, a hospital has a greater responsibility for the welfare of its patients than merely to maintain a pool of trained nurses from which the various attending physicians may select their assistants. Many courts have increasingly recognized that a hospital has a responsibility for the exercise of due care by a nurse (as well as by other hospital employees) while she is performing acts of a character which, though constituting a part of the patient's treatment as prescribed by the attending physician, do not require either the application or the understanding of the specialized technique possessed by a skilled physician or surgeon. In taking this view these courts classify the acts of nurses and other employees for which a hospital is liable in tort as administrative or clerical acts, and the acts for which it has no such liability as those which require an exercise of medical skill or judgment. Whether an act is merely administrative, so that negligence in its performance is imputed to the hospital, or nonadministrative depends on the nature or character of the act.

* * * * *

"We adopt the rule that a hospital is liable for the negligence of its nurses in performing mere administrative or clerical acts, which acts, *though constituting a part of a patient's prescribed medical treatment,* do not require the application of the specialized technique or the understanding of a skilled physician or surgeon. This rule, in recognizing that the right of control remains with the hospital as the general employer, is consistent with the nature of such acts and is in accord with the custom which in everyday practice governs the relationship between the hospital staff and the attending physicians."

The Swigerd case involved a patient who, after he had fallen out of bed, had been restrained by having one arm and the opposite leg tied to the bed; a heat lamp placed too near the bed being the cause of the

burns which proved fatal to the patient. This court held that the evidence sustained a finding of negligence against the hospital. While the court below ordered judgment for defendant notwithstanding the verdict of the jury, this court reversed, which reinstated the verdict.

■ In the instant case we find the evidence following a peculiar pattern. No one remembers what is important. They answer by stating the policy of the hospital. There are differences and conflicts in the testimony as between the doctor attending plaintiff and the nurses administering to his care, needs, and safety during his stay in the hospital. Some of the testimony must be termed circumstantial, and there are inferences to be drawn from the testimony as a whole. The credibility and the weight of the testimony of the various witnesses clearly belong in the factfinding field. The differences and the conflicts between the testimony of the several witnesses are clearly for jury determination. Where the evidence is conflicting, it is the duty of the court to submit the case to the jury.

There is a distinction which it appears the trial court failed to observe in his direction of the verdict. This is not the usual malpractice case involving the duty of the physician or surgeon to use his best judgment in any case of doubt as to the proper course of treatment. In such cases the physician or surgeon is not responsible for damages for want of success unless it be shown to be the result of want of such skill and learning as is ordinarily possessed by others in his profession in his community or of want of ordinary care and attention.

Plaintiff's physician here did no more than administer the technical part of the treatments as the evidence clearly indicates and was not made a party to the action. According to the doctor's own statements he depended upon the hospital and its staff of nurses to take over completely after he had administered the shock treatment. In fact, the trial court directed a verdict on the ground that the evidence was overwhelmingly in favor of defendant hospital, rather than on the ground that the hospital was free from negligence as a matter of law. He did not state that the plaintiff was guilty of contributory negligence as a matter of law but said to the jury that the plaintiff apparently knew enough to know what he was doing so that maybe he was contributorily

negligent in what he did. We have difficulty in ascribing to the evidence any such overwhelming weight. As we see it, a jury could find from the evidence and the inferences permissible therefrom that defendant was not negligent or it could find that it was negligent and that its negligence was a proximate cause of plaintiff's injury. It is not our province to indicate how this case ought to be finally decided. Clearly, plaintiff received the injury complained of while a patient in the hospital.

Where questions of law and fact are involved, well-established rules generally require that questions of fact on which evidence is conflicting are to be determined by the jury, and this includes the weight to be given to the conflicting evidence. Whether in the instant case the particular act giving rise to the injury complained of was or was not negligent; whether the hospital exercised the requisite degree of care for plaintiff's safety as its patient; whether the members of the hospital staff of nurses and aides ought to have foreseen the probable occurrence resulting injury to the plaintiff and thus furnished adequate protection to him as a patient; and whether the defendant was negligent as a proximate cause resulting in injury to the plaintiff are all questions for the jury, as would be the question here whether plaintiff was himself contributorily negligent, barring his recovery.[5]

The testimony of Mrs. Quick that one of defendant's nurses had said that plaintiff fell out of bed right after the treatment was received without objection and constituted affirmative proof of the fact that plaintiff did not fall out of bed as stated. The rule is well settled that hearsay testimony received without objection has probative force and is sufficient to raise a fact issue for the jury as to the truth of the facts stated in such testimony.[6] The defendant contends that it entered a

---

[5]See, 41 C. J. S., Hospitals, § 10b.

[6]See, Erickson v. Paulson, 251 Minn. 183, 87 N. W. (2d) 585; State v. Gifis, 195 Minn. 276, 262 N. W. 637; State v. Shansy, 164 Minn. 10, 204 N. W. 467; Barlow v. Verrill, 88 N. H. 25, 183 A. 857, 104 A. L. R. 1126; Schlemmer v. Buffalo, R. & P. Ry. Co. 205 U. S. 1, 27 S. Ct. 407, 51 L. ed. 681; Annotation, 104 A. L. R. 1130; 7 Dunnell, Dig. (3 ed.) § 3288.

timely objection to the admission of Mrs. Quick's testimony. However, the transcript indicates that the court made no ruling on the objection raised by counsel. Apparently it was pressed no further. It has been held that failure of counsel to insist upon a ruling to this objection constitutes a waiver thereof.[7]

If this case should be retried, no doubt the hearsay issue will again come before the court. McCormick, Evidence, § 228, suggests that the notion is that proof that one talks about a matter raises an inference, apart from veracity, that that person was conscious or aware of it. Ordinarily to show the latter fact, other evidence is relied on. The evidence by Valerie Quick, plaintiff's wife, in the case at bar, that one of the nurses stated to her that the plaintiff patient, her husband, had fallen out of bed that morning after treatment and was injured, would therefore seem to rest on the nonhearsay ground that such remark tended to show that, if the patient had fallen out of bed and was injured, the nurse was aware of it and that it occurred on that morning on the day on which the statement was made. Also, so far as the hearsay rule is concerned, the testimony of Mrs. Quick might well be admissible under some exception to the hearsay rule such as may be based upon the admissions of parties and their agents. Many courts hold that testimony as to extrajudicial post rem statements of an agent is admissible at least for the limited purpose of proving knowledge of certain facts or conditions at or prior to the time of a personal injury in instances where such knowledge is material.[8] Much depends upon and must, in the first instance, defer to the exercise of the trial court's discretion in ruling on the question of its admissibility.

We conclude that the court erred in directing a verdict and in not hearing the evidence on both sides and submitting the case to the jury. For that reason there should be a new trial.

Reversed and a new trial granted.

---

[7]53 Am. Jur., Trial, § 143; Smith v. Twin City Motor Bus Co. 228 Minn. 14, 36 N. W. (2d) 22; United States v. McCoy, 193 U. S. 593, 24 S. Ct. 528, 48 L. ed. 805.

[8]See, McCormick, Evidence, § 244; Restatement Agency, § 289; Annotation, 141 A. L. R. 704 to 710.