**Suzanne TOMFOHR, as trustee for the heirs of John Tomfohr, deceased, Plaintiff,**

**v.**

**The MAYO FOUNDATION and St. Mary's Hospital, Defendants.**

**No. C8–89–1148.**

Supreme Court of Minnesota.

Jan. 12, 1990.

Craig A. Beck, Dorsey & Whitney, Rochester, and Thomas Tinkham, Michael J. Wahoske, Laurie A. Vasichek, Minneapolis, and Ann E. Decker, Legal Counsel, Mayo Clinic, Rochester, for defendants.

John C. Goetz, Schwebel, Goetz & Sieben, P.A., Minneapolis, for plaintiff.

Minnesota Psychiatric Soc., Fredrikson & Byron, P.A., Robert C. Boisvert, Jr., Minneapolis, amicus curiae.

KELLEY, Justice.

This case comes to us on an Order of Certification issued by the United States District Court for the District of Minnesota pursuant to Minn.Stat. § 480.061 et seq. (1988) (the Uniform Certification of Ques-

tions of Law Act).[1] The certified question we address reads:

> In a medical malpractice action maintained by a trustee for the heirs and next of kin of a decedent patient who, immediately prior to or at the time of his voluntary admission to a psychiatric hospital was diagnosed as suffering from severe depression; expressed to hospital authorities concern relative to his ability to control his own impulses; expressed suicidal thoughts as well as homicidal urges focusing on members of his family, and, who, upon admission, was locked in a psychiatric ward and placed on suicidal precaution program, but, nonetheless, while alone in his room committed suicide by hanging, is it error, as a matter of law, under Minn.Stat. § 604.01, subd. 1 (1988), for the trial court not to submit a capacity based instruction to the jury concerning the patient's comparative fault?[2]

We answer the question in the negative.

John Tomfohr was a forty-two-year-old architect who was employed by a large architectural firm. In 1985 his firm transferred him from the Midwest to Los Angeles, California. Apparently the transfer and concomitant problems relative to moving his family and working in a new environment triggered the onset of personal emotional distress to the point that Tomfohr developed severe depression with suicidal and homicidal ideations. In August 1985, Tomfohr returned to his parents' home in Red Wing, Minnesota, in order to receive treatment for his depression at the Mayo Clinic in nearby Rochester. Although his initial appointment at the Mayo Clinic was scheduled for August 15, because he felt he could wait no longer, on August 14 he presented himself at St. Mary's Hospital emergency room in Roch-

ester. On that occasion he received counseling and medication, after which he returned to Red Wing. The following day he had his scheduled out-patient evaluation with a Mayo Clinic psychiatrist during which he revealed his then current ideations concerning suicide. Although he agreed to voluntarily admit himself into the general psychiatric ward—an open unit of St. Mary's Hospital—he later requested a postponement and was not actually admitted at the agreed upon time.

On August 19, however, he again presented himself to the emergency room of the hospital, and on this occasion requested immediate hospitalization. Once again he reported that he was extremely depressed, that he was worried about killing himself, his parents, and children, and pled for treatment. During this emergency room interview, Tomfohr opined that considering the extent and nature of his depression, hospitalization in the open unit might not be appropriate. Apparently hospital authorities agreed because he was admitted to the locked or closed unit of the hospital. During that preadmission interview, although admitting to suicidal ideations, Tomfohr had denied any current thoughts of suicide. Later, following his admission, Tomfohr was reinterviewed by another psychiatrist who, after hearing Tomfohr's chief complaints of two weeks of deep depression and suicidal thoughts, which apparently came on periodically but suddenly, made a preliminary diagnosis of major depression. Notwithstanding his suicidal ideations, Tomfohr was not then considered to be a serious suicidal risk. Nonetheless, hospital personnel attempted to remove from him all belongings which might be used self-destructively. They omitted, however, to take from him a leath-

1. The Honorable Donald P. Lay, Chief Judge of the United States Court of Appeals for the Eighth Circuit sat by designation as a district judge for the United States District Court for the District of Minnesota.

2. The question certified as set out in the text differs slightly from the actual question certified by Judge Lay. We have rephrased it by exercise of that discretion extended to us by Judge Lay in his Certification Order in an at-tempt to focus upon the precise issue we deem to be dispositive. Judge Lay, as part of his certification, furnished us with a certified statement of facts. The facts stated in the text of our opinion have been extracted from that statement. Additionally, however, we culled from the record furnished to us additional facts we deemed relevant to the ultimate answer to the certified question.

er duffel bag with a detachable shoulder strap. During the day his condition deteriorated, and notwithstanding medication, during a short interval while he was left alone, he hung himself from a door with that strap.

A trustee appointed by the court subsequently commenced the present action against appellants for the benefit of Tomfohr's heirs and next of kin pursuant to Minn.Stat. § 573.02 (1988) (Minnesota's Death by Wrongful Act Statute) alleging that the hospital had been negligent in failing to prevent the suicide.

At the conclusion of the evidence at trial, the court denied appellant's request to submit questions of Tomfohr's contributory negligence and assumption of risk under Minn.Stat. § 604.01, subd. 1 (1988) (Minnesota Comparative Fault Statute). The jury subsequently returned a verdict against both appellants for $940,000. As one of several grounds urged by the appellants in their post-trial motion seeking a new trial, they asserted the trial court erred when it refused to submit the issue of Tomfohr's negligence for comparison pursuant to that statute. Because this diversity action is controlled by Minnesota law and this court has never addressed the specific issue, and because a "decisional split regarding the use of a 'capacity based standard,' in contrast to dealing with the issue in terms of foreseeable risk * * * " exists, Judge Lay certified the question we address today [patient's alleged contributory negligence]. Meanwhile, he reserved his decision on the pending motion for a new trial in which other matters not before us today were in issue. In briefs submitted to this court defendants in the trial court have been designated as appellants and plaintiff below as respondent.

■ Ordinarily, in a death by wrongful act negligence case, any fault attributable to a patient is compared with that attributable to the defendant medical provider. The jury is usually instructed that the pa-

tient has a concurrent duty to exercise reasonable care for his own self protection, even though the patient has reduced capacity due to a mental illness. *See Quick v. Benedictine Sisters Hosp. Ass'n,* 257 Minn. 470, 485, 102 N.W.2d 36, 47 (1960). Appellants ask us to define "fault," as used in the comparitive statute, to include an intentional volitional act of committing suicide, or, alternatively, to adopt a "capacity based" comparative negligence standard.[3]

■ We have not before been called upon to address the precise issue raised by the certified question. However, as a prelude to our analysis, a short review of our cases interpreting the comparative fault statute may be helpful.

Historically, we have liberally applied comparative fault principles even to situations in which other jurisdictions have refused such application. In doing so, we have noted that Minn.Stat. § 604.01, subd. 1a has by its terms, for example, expanded comparison in products liability cases to include consumer negligence, misuse, or assumption of risk. *See Seim v. Garavalia,* 306 N.W.2d 806, 809 (Minn.1981). In certain circumstances we have applied comparative fault principles when the injured claimant is a small child by endorsing a comparative fault jury instruction containing a flexible fault standard similar to the type of capacity based standard appellants urge us to apply in this case. *See, e.g., Toetschinger v. Inhot,* 312 Minn. 59, 63–65, 250 N.W.2d 204, 207–08 (1977). On the other hand, we have recognized that some young children, because of their tender years, inexperience, or the subtleties of the dangers to be apprehended, cannot be held to a contributory fault standard, and we have left that determination largely within the discretion of the trial judge. *See, e.g., Gryc v. Dayton–Hudson Corp.,* 297 N.W.2d 727, 743 (Minn.), *cert. denied sub nom. Riegel Textile Corp. v. Gryc,* 449 U.S. 921, 101 S.Ct. 320, 66 L.Ed.2d 149

**3.** Employment of a "capacity based" standard requires that the conduct of a mentally disturbed patient be measured by taking into consideration the extent of the patient's mental ca-

pacity. *See, e.g., Warner v. Kiowa County Hosp. Authority,* 551 P.2d 1179, 1189 (Okla.Ct.App. 1976).

(1980); *Watts v. Erickson*, 244 Minn. 264, 268–69, 69 N.W.2d 626, 629 (1955); *Audette v. Lindahl*, 231 Minn. 239, 242, 42 N.W.2d 717, 719 (1950). We also recognize another exception to the application of comparative fault in cases where liability to the plaintiff is predicated upon a statute designed to protect a class of which the plaintiff is a member, especially when the obvious purpose of the statute is to protect the people in that class from their own inability to protect themselves. *See, e.g., Seim v. Garavalia*, 306 N.W.2d 806, 811 (Minn.1981); *Zerby v. Warren*, 297 Minn. 134, 140–41, 210 N.W.2d 58, 64 (1973); *Dart v. Pure Oil Co.*, 223 Minn. 526, 535, 27 N.W.2d 555, 561 (1947).

Finally, we note that in some circumstances we have held it appropriate to apply comparative fault principles using a reduced capacity standard even though the claimant suffers from a mental deficiency or disorder. *See, e.g., Quick v. Benedictine Sisters Hosp. Ass'n*, 257 Minn. 470, 485, 102 N.W.2d 36, 47 (1960).

Appellants argue that this history of interpretation of the comparative fault statute evinces an affirmative answer to the question certified. They contend such a holding is consistent with the broad interpretation and application we have traditionally afforded the comparative fault statute. In addition, they maintain that *Quick* provides precedent for applying a comparative fault standard with a reduced capacity component when the claimant is a mentally ill patient in a hospital.

Respondent, on the other hand, argues that the situation which existed on August 19, 1985, at St. Mary's Hospital, when Tomfohr admitted himself to the locked psychiatric ward for the precise reason that he felt he could not control his own suicidal or homicidal actions, is more akin to those cases involving violations of statutes designated to protect a class of which the claimant is a member. Alternatively, respondent argues its position is supported by those cases which refuse to apply a comparative fault analysis when a minor, who, because of his tender years and mental inability to apprehend the danger of his actions, is the claimant. In other words, respondent's position is that Tomfohr's conduct was relevant only to the determination of whether his suicide was reasonably foreseeable by the hospital.

The trial court refused to give the proffered instruction because, in general agreement with respondent, he thought that Tomfohr's fault was subsumed by an instruction which was given, by which the jury was to assess whether Tomfohr's self-destructive act was foreseeable in the light of all then existing circumstances. In so concluding, the trial judge placed reliance on two cases: *Mounds Park Hosp. v. Von Eye*, 245 F.2d 756 (8th Cir.1957) (involving Minnesota law and the duty of care medical professionals owe a mentally ill patient) and *Cowan v. Doering*, 215 N.J.Super. 484, 522 A.2d 444 (App.Div.1987); *aff'd*, 111 N.J. 451, 545 A.2d 159 (1988).

In *Mounds Park*, although the issue of the fault of the mentally ill patient who had jumped from a hospital window was never discussed, the court, largely in reliance on *Sylvester v. Northwestern Hosp.*, 236 Minn. 384, 53 N.W.2d 17 (1952), defined the scope of the hospital's duty toward a mentally ill patient:

> While a hospital is not an insurer of a patient's safety it owes its patients the duty of protection and must exercise such reasonable care toward a patient as his known condition may require and the duty of care imposed on a hospital extends to safeguarding the patient from dangers due to mental incapacity where that mental incapacity is known * * *.

*Mounds Park*, 245 F.2d at 759.

Both *Mounds Park* and *Sylvester*, as well as *Mesedahl v. St. Luke's Hosp. Ass'n*, 194 Minn. 198, 259 N.W. 819 (1935) (hospital must use reasonable care to prevent suicide), circumscribe the range of a medical provider's duty to prevent foreseeable harm, including self-inflicted injuries. The three cases seem to stand for the general proposition that when a mentally ill patient has ascertainable decreased ability to control his or her self destructive behavior, that inability becomes a component of the scope of the foreseeability of harm.

*See also Clements v. Swedish Hosp.,* 252 Minn. 1, 7, 89 N.W.2d 162, 166 (1958). Using this duty of the medical care provider to prevent foreseeable harm as a base, the trial judge went one step further to apply the rationale of *Cowan v. Doering,* 111 N.J. 451, 545 A.2d 159 (1988), which holds that when the actions taken by the patient as the result of the mental illness are the very acts which the medical provider had a duty to prevent, the provider's own failure to prevent the suicide should not create its own defense. *Cowan,* 111 N.J. at 460–63, 545 A.2d at 162–64. To restate the holding in that case within the context of this case, when St. Mary's Hospital voluntarily undertook the duty to protect Tomfohr from self-inflicted injury, it assumed the duty of exercising reasonable care to see that the event did not occur. Therefore, the patient, Tomfohr, cannot be held responsible in whole or in part for the breach of the duty to exercise care for his own well being, because the hospital had already assumed that duty. *See, e.g., Hunt v. King County,* 4 Wash.App. 14, 24, 481 P.2d 593, 599 (1971); *Kusah v. McCorkle,* 100 Wash. 318, 326, 170 P. 1023, 1026 (1918).

It seems to us, in the light of the facts of this case, that approach to analyzing the duty and causation issues was appropriate. When the jury has been asked, as it was here, to determine whether the suicide attempt was reasonably foreseeable, given the circumstances surrounding the patient's admission and his mental state, it is not only unnecessary but also duplicative to again review the patient's conduct to determine whether the patient's volitional act requires the application of comparative fault. In this specific type of case, the mental condition of the patient exists prior to the hospital's negligent act, and it is that condition which gives rise to the hospital's duty of care and which defines the scope of that duty. The law has long recognized that a custodian of another person may be liable for consequences of harm to that person inflicted by a third person when that harm is reasonably foreseeable. *See Restatement (Second) of Torts* § 320 (1965). It seems to us logical to apply that same rule if the foreseeable harm is self-in-flicted. Therefore, we answer the certified question in the negative.

In that connection, we point out that this case differs from *Quick v. Benedictine Sisters Hosp. Ass'n,* 257 Minn. 470, 102 N.W.2d 36 (1960). In *Quick,* although the patient was mentally ill, he injured himself when he fell out of bed after having electric shock treatments. In *Quick* the patient's injuries were not the result of the mental illness for which he had been hospitalized. They resulted from either the nurses' failure to raise the bed side rail after a treatment or the patient's lowering of the rail. In other words, in *Quick,* the patient's injuries were not the result of the very thing the patient was attempting to prevent by hospitalization. Due to this factual distinction, we believe that *Quick* does not compel the conclusion appellants would have us draw in this case.

While answering the certified question in the negative, we wish to stress that this ruling is limited to the type of factual situation presented by this case, to-wit, an attempted suicide committed by a mentally ill patient admitted to a locked hospital ward where the medical staff was aware of his suicidal ideations. Our decision in this case should not be construed as a *per se* rejection of a capacity-based comparative fault standard in other factual situations. Rather, somewhat similar to, and consistent with the analysis applied in cases involving the comparative fault of small children, our holding today only stands for the proposition that cases may exist, such as this one, where a trial judge may rule, as a matter of law, that the patient could not be at fault because he lacked the capacity to be responsible for his own well being, and that the obligation of self care was transferred to the health care provider when it admitted the patient into its care.

The certified question is answered in the negative.

KEITH, J., took no part in the consideration or decision of this case.