Carlyn M. SANDBORG, Trustee fir the Next of Kin of Robert H. Sandborg, Jr., Appellant,

v.

BLUE EARTH COUNTY,
et al., Respondent.

No. C6-99-243.

Court of Appeals of Minnesota.

Sept. 21, 1999.

Rehearing Granted in Part Nov. 23, 1999.

Keith L. Deike, Patton, Hoversten & Berg, P.A., Waseca, MN (for appellant)

Roger L. Rowlette, Jenell M. Matthews, Johnson & Lindberg, P.A., Minneapolis, MN (for respondent)

Considered and decided by KLAPHAKE, Presiding Judge, ANDERSON, Judge, and HALBROOKS, Judge.

## OPINION

HALBROOKS, Judge

Appellant Carlyn Sandborg, trustee for the next of kin of Robert H. Sandborg, Jr., challenges the trial court's denial of her motions for judgment notwithstanding the verdict and a new trial. Appellant argues: (1) the trial court erred by failing to instruct the jury that respondents owed Sandborg a duty to take reasonable measures to prevent his self-injury; (2) the trial court erred by instructing the jury on comparative fault; and (3) the trial court erred by not granting judgment notwithstanding the verdict. We hold that the trial court erred by failing to instruct the jury that the respondents owed appellant's decedent a duty as a matter of law. We reverse and remand for a new trial on liability only.

## FACTS

On May 14, 1993, appellant's decedent Robert H. Sandborg, Jr., was arrested and booked at the Blue Earth County Jail on a charge of felony second-degree criminal sexual conduct for allegedly molesting an 11-year-old girl earlier that day. Prior to his arrest, Sandborg had called the police to report his crime and request that he be arrested. Mankato Police Officers Walsh and Myers were dispatched to Sandborg's location. Walsh identified Sandborg and observed that he was visibly shaking and his eyes and nose were reddened as if he had been crying. Walsh placed Sandborg in her squad car. Moments later, the juvenile female approached the officers and reported that Sandborg had molested her.

Walsh transported Sandborg to the Law Enforcement Center and conducted a preliminary interview. Sandborg then gave a formal statement, admitting the incident in detail. At one point during the formal statement, Sandborg, referring to the time immediately following the incident, stated:

> I kept pacing back and forth, back and forth, I couldn't, couldn't slow down, I just wanted to tell somebody real bad.

> It was either tell somebody or get gun [sic], gun and use it on myself. I was really, really seriously [sic] thought about killing myself after that but I didn't think I was that kind of a person.

Walsh asked if Sandborg was still thinking about killing himself, and he replied, "A little, not as much as before."

After spending approximately three hours with Sandborg, Walsh brought him to the jail. Before admitting him to the jail, Walsh partially completed a "Personal History" form on Sandborg. On that form, Walsh placed a "Y" next to the question asking, "Does inmate exhibit behavior suggesting suicide/assault?"

Respondent Custody Officer Norman Knowles booked Sandborg into the jail while Walsh was present. Walsh gave Knowles the personal history form. During the booking process, Knowles asked Sandborg whether he was suicidal. Knowles testified at trial that Sandborg responded, "No, not at this time." Walsh testified at trial that Sandborg "indicated that he had thought about it seriously at one point, but at the time it was just coming and going." Knowles did not ask Sandborg any further questions regarding his emotional state.

While Knowles completed the booking, Walsh spoke to respondent Custody Officer James Sheppard in the hallway. Walsh explained to Sheppard that Sandborg had made some suicidal comments during the interview. Sheppard informed Walsh that there were no other prisoners at the jail with whom to house Sandborg. Sheppard testified at trial that state guidelines provided unsentenced felons must be housed with other unsentenced felons and Sandborg was the only unsentenced felon in the jail at that time.

Sandborg was housed alone in a cellblock known as "S. Max.," a five-man cell surrounded by solid walls with viewing ports cut into the walls. There are metal covers for the viewing ports, but all jail personnel testified those ports were gener-

ally left open so an officer could observe the prisoner while walking by the cell.

After Sandborg was escorted to his cell, Sheppard went into the cell to determine whether Sandborg needed any help or should be placed in medical isolation. Sheppard asked whether Sandborg wanted to talk to anyone, and Sandborg responded that he did not. Sheppard also asked whether Sandborg was going to do anything "foolish," to which Sandborg responded, "No." After speaking to Sandborg for five to ten minutes, Sheppard concluded he seemed fine.

In addition to the regularly recorded hourly cell checks, Sheppard and Knowles each testified they performed numerous informal checks on Sandborg while walking by the cell and didn't observe any unusual behavior on Sandborg's part. Custody Officer Carstensen also testified that he observed Sandborg's behavior to be normal, giving no indication of mental illness or suicidal ideation.

On May 16, 1993, Sandborg's mother, appellant Carlyn Sandborg, visited him. She arrived at the jail at 1:10 p.m. and visited with him until 1:38 p.m. During the visit, they discussed seeking the services of a bail bondsman in order to obtain Sandborg's release from jail. Sandborg seemed to be in good spirits and indicated he was looking forward to getting out of jail. Appellant was not concerned that Sandborg was suicidal when she left him at the end of the visit. After the visit, Sandborg was returned to his cell.

Shortly thereafter, at approximately 1:58 p.m., appellant telephoned the jail and spoke to Carstensen regarding bail bondsmen. Immediately after the call, Carstensen attempted to relay a message to Sandborg over the intercom, but Sandborg did not reply. Carstensen then went back to Sandborg's cell, at which time he found Sandborg hanging by his bedsheet. With assistance from a co-worker, Carstensen was able to cut Sandborg down and begin CPR. Paramedics arrived and were able to restore a heartbeat, but Sandborg died at the hospital two days later as the result of injuries he received from hanging himself.

At trial, appellant's expert testified that a reasonable custody officer would have refused admittance to the jail based on Walsh's indication that Sandborg may have been suicidal. In the alternative, the expert testified that Sandborg should have been placed under constant observation. Appellant's expert also testified that once a person decides to commit suicide, he becomes calm or even euphoric. He testified respondents' training was inadequate, but he admitted that their training met Department of Corrections guidelines. The officers had received suicide training conducted by the State of Minnesota Sheriff's Association, the Minnesota Department of Corrections, and the Minnesota Jail Resource Center shortly before this incident occurred.

Appellant, trustee for Sandborg's next of kin, brought the instant action against respondents alleging negligence and violation of Sandborg's civil rights. A jury trial was held. At the close of evidence, the trial court gave the following negligence instruction:

> Negligence is a failure to use reasonable care. Reasonable care is that care which a reasonable person would use under like circumstances. Negligence is the doing of something, which a reasonable person would not do, or the failure to do something which a reasonable person would do under like circumstances.

> You must determine whether the Defendant, Blue Earth County, acting through its employees, owed a duty to Robert Sandborg, whether it was negligent in performing that duty, and whether that negligence was a direct or proximate cause of the harm suffered.

The trial court also gave a comparative fault instruction. The jury returned special verdicts finding negligence on the part of Sandborg, but no negligence and no civil rights violations on the part of respon-

dents. The jury found damages totaling $157,428.26.

Appellant brought a post-trial motion for judgment notwithstanding the verdict or, in the alternative, a new trial on the negligence claim. The trial court concluded it had erred by submitting the duty issue to the jury rather than determining there was a duty as a matter of law, but nevertheless denied appellant's motions, ruling the error was harmless in light of the jury's finding of no negligence on the part of respondents. Judgment was entered and this appeal followed.

## ISSUES

1. Did the trial court abuse its discretion by denying appellant's motion for a new trial?
2. Did the trial court err in denying appellant's motion for judgment notwithstanding the verdict?

## ANALYSIS

### 1. New Trial Motion

#### a. Duty Instruction

■ Appellant argues the trial court's instruction on duty did not correctly state the applicable law and the trial court should have determined there was a duty as a matter of law. A trial court has broad discretion in determining jury instructions. *State Farm Fire & Cas. Co. v. Short*, 459 N.W.2d 111, 113 (Minn.1990). Where instructions fairly and correctly state the applicable law, an appellate court will not grant a new trial. *Alevizos v. Metropolitan Airports Comm'n*, 452 N.W.2d 492, 501 (Minn.App.1990), *review denied* (Minn. May 11, 1990). Jury instruction errors are not grounds for reversal unless the error is prejudicial. *Lewis v. Equitable Life Assurance Soc'y*, 389 N.W.2d 876, 885 (Minn. 1986).

■ The existence of a legal duty is generally an issue for the court to decide as a matter of law. *Larson v. Larson*, 373 N.W.2d 287, 289 (Minn.1985). Generally,

there is no duty to protect another person, even if protection is reasonably known to be necessary. *Donaldson v. Young Women's Christian Ass'n*, 539 N.W.2d 789, 792 (Minn.1995); Restatement (Second) of Torts § 314 (1965). But a legal duty to act to protect another person is imposed under certain circumstances when a special relationship exists between the parties. *Id.*

When * * * a person has custody of another under circumstances in which the other person is "deprived of normal opportunities of self protection," such a duty is imposed on the custodian because of the special relationship that exists between custodian and detainee.

*Cooney v. Hooks*, 535 N.W.2d 609, 611 (Minn.1995) (holding government had general duty to protect prisoners from attack by other prisoners) (citation omitted); *see also* Restatement (Second) of Torts § 314A(4) (1965) (stating duty arises when one is required by law to take custody of another "under circumstances such as to deprive the other of his normal opportunities for protection").

Appellant contends the trial court erred by not instructing the jury as a matter of law that respondents had a duty to protect Sandborg from self-injury. Courts have generally been reluctant to impose liability on others for self-inflicted harm. *Donaldson*, 539 N.W.2d at 792. But the duty to protect a person from self-injury has been found "where an institution such as a hospital or jail has physical custody and control of the person to be protected." *Id.* (citations omitted).

■ Although Minnesota courts have not yet determined whether a jail may owe a duty to protect prisoners from self-injury, *id.* at n. 4, a number of jurisdictions have determined that jail or prison authorities have a duty of reasonable care to protect a prisoner from self-injury if they know or have reason to know the prisoner might do harm to himself. *See* Jane M. Draper, Annotation, *Civil Liability of Prison or Jail Authorities for Self-inflict-*

*ed Injury or Death of Prisoner*, 79 A.L.R.3d 1210, 1214 (1977).

■ "A jailer is not, however, a guarantor of the safety of a prisoner." *Cooney*, 535 N.W.2d at 611 (citation omitted). The duty of protection only arises when the harm to be prevented is foreseeable under the circumstances. *Id.* Respondent relies on *Lundgren v. Fultz*, 354 N.W.2d 25, 28 (Minn.1984), for the proposition that close questions of foreseeability are properly jury questions. But subsequent to the decision in *Lundgren*, the supreme court has noted:

> [W]e are troubled by the practice of placing foreseeability within the jury's domain. The foreseeability issue, as a threshold issue, is more properly decided by the court prior to submitting the case to the jury. If the trial court concludes that the innkeeper did not have notice of the person's dangerous propensities, then it must find that the injury would not have been foreseeable to a reasonable innkeeper and thus, no duty to protect arose.

*Cooney*, 535 N.W.2d at 612 (quoting *Alholm v. Wilt*, 394 N.W.2d 488, 491 n. 5 (Minn.1986)).

■ Under the circumstances of the instant case, we conclude it was reasonably foreseeable that Sandborg might attempt suicide. First, although there is conflicting testimony over what Sandborg reported to Knowles at booking, the evidence is uncontradicted that Walsh indicated via the "Personal History" form that Sandborg exhibited behavior suggesting suicide/assault. Second, appellant's expert testified that the nature of the crime itself was sufficient to place respondents on notice of the possibility of self-injurious behavior; the evidence is certainly clear that Sandborg was ashamed and humiliated because of the offense. Finally, Walsh also told respondent Sheppard that Sandborg had made some suicidal comments. The trial court acknowledged in its memorandum denying the post-trial motions that it should have instructed the jury as a matter of law that respondents owed Sandborg a duty of reasonable care to protect him from self-injury under these circumstances. We agree.

■ We disagree, however, with the trial court's determination that a new trial was not necessary because the jury found respondents were not negligent. The existence of a duty is an element of a negligence claim. *Schweich v. Ziegler, Inc.*, 463 N.W.2d 722, 729 (Minn.1990). Although it is possible the jury found there was a duty, but no negligence, it is also possible the jury found no negligence *because* it found no duty. "If an instruction is erroneous and an appellate court is unable to determine whether the error affected the jury, a new trial should be granted." *Apache Plaza, Ltd. v. Midwest Sav. Ass'n*, 456 N.W.2d 729, 733 (Minn.App.1990), *review denied* (Minn. Aug. 23, 1990). Because the trial court's instruction allowed the jury to decide there was no duty to protect Sandborg from self-injury, it is impossible to determine whether the error affected the verdict. We, therefore, conclude the trial court abused its discretion by denying appellant's motion for a new trial.

### b. Comparative Fault

■ Appellant also argues the trial court erred by instructing the jury on comparative fault. In an action to recover damages for fault resulting in death,

> the court may, and when requested by any party shall, direct the jury to find separate special verdicts determining the amount of damages and the percentage of fault attributable to each party and the court shall then reduce the amount of damages in proportion to the amount of fault attributable to the person recovering.

Minn.Stat. § 604.01, subd. 1 (1998). Minnesota courts have "liberally applied comparative fault principles even to situations in which other jurisdictions have re-

fused such application." *Tomfohr v. Mayo Found.*, 450 N.W.2d 121, 123 (Minn.1990).

Appellant relies on *Tomfohr* for the proposition that comparative fault is inapplicable when a defendant has a duty to prevent foreseeable self-injury. *See id.* at 125. We believe appellant reads *Tomfohr* too broadly.

In *Tomfohr*, an individual with major depression and suicidal and homicidal ideations was admitted to the locked unit of a hospital psychiatric ward at his own request. *Id.* at 122. Although he was not considered to be a serious suicide risk at the time of admission, hospital staff were aware of his suicidal ideations and attempted to remove items from him that could be used self-destructively. *Id.* They neglected, however, to take from him a leather duffel bag with a removable shoulder strap. *Id.* at 122–23. He later hanged himself from a door using that strap. *Id.* at 123.

The supreme court held the trial court did not err by refusing to instruct on "capacity based"[1] comparative fault. *Id.* at 125. But the supreme court expressly limited its holding to the facts present in *Tomfohr*, stating

> [T]his ruling is limited to the type of factual situation presented by this case, to-wit, an attempted suicide committed by a ***mentally ill patient*** admitted to a ***locked hospital ward*** where the medical staff was aware of his suicidal ideations. * * * [O]ur holding today only stands for the proposition that cases may exist, such as this one, where a trial judge may rule, as a matter of law, that the patient could not be at fault because he ***lacked the capacity to be responsible for his own well being***, and that the obligation of self care was transferred to the health care provider when it admitted the patient into its care.

*Id.* (emphasis added).

In the instant case, by contrast, there was no evidence that Sandborg was mentally ill. Furthermore, in contrast to the patient in *Tomfohr*, who was admitted to the hospital because he believed he could not control himself, Sandborg was in jail because he admitted he committed a felony sex crime. There was no evidence from which the trial court could have ruled as a matter of law that Sandborg lacked capacity. Unlike the mentally ill patient in *Tomfohr*, Sandborg had the capacity to share the responsibility for his own well-being. We, therefore, conclude the trial court did not err by instructing the jury on comparative fault under Minn.Stat. § 604.01, subd. 1.

## 2. Judgment Notwithstanding the Verdict

Appellant also argues that the district court erred by denying the motion for judgment notwithstanding the verdict.

> A motion for judgment notwithstanding the verdict admits every inference reasonably to be drawn from the evidence as well as the credibility of the testimony for the adverse party. Unless we are able to determine that the evidence is practically conclusive against the verdict, or that reasonable minds could reach but one conclusion against the verdict, the trial court's order denying the motion for judgment notwithstanding the verdict should stand.

*Seidl v. Trollhaugen, Inc.*, 305 Minn. 506, 507, 232 N.W.2d 236, 239 (1975).

Our review of the trial record in the instant matter convinces us that reasonable minds could differ as to the negligence element and the proximate cause element. These are issues properly resolved by a jury.

## DECISION

Because the trial court's failure to instruct the jury on respondents' duty may have allowed the jury to avoid the negli-

---

1. A "capacity based" standard requires the jury to consider the patient's mental capacity when apportioning fault. *Tomfohr*, 450 N.W.2d at 123 n. 3.

gence issue, the trial court abused its discretion in denying appellant's motion for a new trial. We, therefore, reverse and remand for a new trial on liability only.

**Reversed and remanded.**