2016 CO 6

**In Re P.W., Individually and as Guardian and Conservator for K.W., a Minor Child, Plaintiff**

v.

**CHILDREN'S HOSPITAL COLORADO; Children's Hospital Colorado Health System; and The Children's Hospital Association, d/b/a The Children's Hospital Corporation, d/b/a The Children's Hospital of Colorado, Defendants**

Supreme Court Case No. 15SA151

Supreme Court of Colorado.

January 25, 2016

892

Attorneys for Plaintiff: Reilly Pozner LLP, Sean Connelly, Denver, Colorado, Hillyard Wahlberg Kudla Sloan & Woodruff LLP, David Woodruff, Steve Wahlberg, Denver, Colorado.

Attorneys for Defendants: Jaudon & Avery LLP, David H. Yun, Jared R. Ellis, Denver, Colorado.

Attorneys for Amicus Curiae The Regents of the University of Colorado: Office of University Counsel, Patrick T. O'Rourke, Erica Weston, Denver, Colorado.

Attorneys for Amici Curiae Colorado Defense Lawyers Association and Community Hospital Association, d/b/a Boulder Community Hospital: Pryor Johnson Carney Karr Nixon, P.C., Stephen J. Hensen, Elizabeth C. Moran, Greenwood Village, Colorado.

Attorneys for Amici Curiae Colorado Trial Lawyers Association: Anna N. Martinez, Greenwood Village, Colorado, Joseph F. Bennett, Colorado Springs, Colorado.

CHIEF JUSTICE RICE delivered the Opinion of the Court.

¶ 1 In this original proceeding stemming from a medical malpractice action, we are asked to decide whether, as a matter of law, a known suicidal patient who is admitted to the secure mental health unit of a hospital and placed under high suicide-risk precautions can be subject to a comparative negligence defense when the patient attempts suicide while in the hospital's custody. Plaintiff P.W. sued Children's Hospital (the Hospital) both individually and as the conservator of his son K.W., who is in a minimally conscious state after suffering a devastating anoxic brain injury when he attempted to kill himself by hanging while at the Hospital. The trial court granted plaintiff's motion for summary judgment and dismissed the Hospital's comparative negligence and assumption of risk defenses. The trial court also issued an order preventing the Hospital from obtaining K.W.'s pre-incident mental health records.

¶ 2 The Hospital petitioned this court for an order to show cause and we agreed to review the following three issues, as framed by the Hospital: (1) whether the trial court abused its discretion by precluding discovery of K.W.'s pre-incident mental health records related to his suicidal ideation even though Plaintiff claims Children's Hospital negligently failed to prevent K.W.'s suicide attempt, (2) whether the trial court abused its discretion by precluding discovery of records from K.W.'s treating psychiatrist and Cedar Springs Hospital when they were a part of a continuing course of treatment that included Children's Hospital, and (3) whether the trial court erred by granting Plaintiff summary judgment dismissing the comparative negligence and assumption of risk defenses despite evidence K.W. could think rationally and protect himself from harm during the hospitalization.

¶ 3 We first analyze the trial court's dismissal of the Hospital's comparative negligence and assumption of risk defenses and hold that it was proper because, under the undisputed facts, the Hospital could not assert those defenses as a matter of law. Second, we conclude that we need not address the trial court's discovery order.

## I. Facts and Procedural History

¶ 4 K.W., a 16-year-old boy, was admitted to the emergency room at Children's Hospital at around 9 a.m. on June 26th, 2013, after his father discovered that he had ingested multiple pills and deeply lacerated his

wrist in a suicide attempt.[1] K.W. had been struggling with depression and suicidal ideation for some time. In fact, he had been to the emergency room at the Hospital only a month earlier, when his concerned psychiatrist, Dr. David Williams, sent him there for a "crisis assessment." After that assessment, K.W. was admitted to Cedar Springs Hospital in Colorado Springs for inpatient psychiatric treatment. He was treated at Cedar Springs from May 25th through 29th and then returned home, where his parents believed "things had improved."

¶ 5 However, at about 3 a.m. on June 26th, while his parents were asleep, K.W. broke into a locked safe full of medications and ingested approximately fifty pills, and then cut his left wrist. When his father woke him up later that morning he noticed the wrist laceration, and K.W. told him about the pills he had taken. They went to the emergency room where the doctors treated K.W. for the drug ingestion and closed his wound. Emergency room staff noted that K.W. would need to be referred to the psychiatric department "after medical clearance given [his] significant suicidal gesture." That day, K.W. told a mental health counselor that he was "suicidal" and that he was a "level 8 out of 10 for wanting to kill [him]self." He also told the counselor that "this was going to happen sooner or later." K.W. told providers he was "disappointed" that his suicide attempt had failed. Hospital staff contacted Dr. Williams and noted his recommendation that K.W. be admitted to the inpatient psychiatric unit. K.W. spent the night at the hospital, where he was monitored by a "one to one" (1:1) sitter and observed closely for suicidal behavior.

¶ 6 The following day, June 27th, K.W. had a psychiatric consultation with Dr. Joseph Schuermeyer, who noted that K.W. was "upset that [suicide attempt] failed" and "still wishes to die." Under "treatment recommendations," Dr. Schuermeyer wrote that K.W. was "clearly a danger to himself and will require inpatient psychiatry hospitalization." Dr. Schuermeyer recommended that

the Hospital "continue 1:1" monitoring in order to ensure K.W.'s safety. Under "danger assessment," Dr. Schuermeyer noted that K.W. was "not able to contract for safety." Given K.W.'s situation, his providers recommended that he be transferred to the Hospital's inpatient psychiatric unit. K.W. and his parents agreed, and K.W. was admitted to the psychiatric unit that evening.

¶ 7 Upon K.W.'s transfer to the psychiatric unit, a provider's progress note states that K.W. was admitted for treatment of depression and suicidal ideation "with hanging and cutting self" and was placed on "high suicidal precautions." According to the Hospital's policy, "high suicide precautions" require the patient to be in sight at all times except when using the bathroom, during which time "staff should stand just outside the door and communicate with the patient at least every 30 seconds." The policy also notes that the patient should be checked every fifteen minutes.

¶ 8 A second provider note, recorded at 6 p.m., indicates that K.W. told a nurse that he "felt he would not attempt to hurt himself while in the hospital." He also told the nurse, "I just want to be dead." The nurse wrote that she encouraged him to talk to staff if he was feeling unsafe or if he wanted to hurt himself and K.W. "indicated he would."

¶ 9 Staff allowed K.W. into his bathroom at approximately 9:55 p.m. Tragically, at 10:15 p.m., a hospital employee discovered that during the time K.W. had been left unattended in the bathroom, he was able to hang himself with his scrub pants. When K.W. was discovered, he was unconscious, pulseless to touch, and not breathing. Hospital staff called a "code blue" and began attempts to resuscitate the boy. They ultimately succeeded in regaining a pulse and K.W. was transferred to the pediatric intensive care unit (PICU) and placed on a ventilator. A doctor at the PICU noted that K.W. "appear[ed] to have been ... without pulses for at least 15–20 minutes." K.W. was diagnosed with a severe, permanent anoxic brain

---

1. When evaluating the propriety of an order granting summary judgment, we recite the facts in the light most favorable to the nonmoving party. *HealthONE v. Rodriguez ex rel. Rodriguez,* 50 P.3d 879, 887 (Colo. 2002).

injury. He is not expected to recover from his injury and remains unable to talk, walk, eat, or take care of himself.

¶ 10 K.W.'s father, P.W., sued the Hospital both individually and on behalf of K.W. The Hospital asserted affirmative defenses of comparative negligence and assumption of risk, and P.W. moved to dismiss the defenses. The court treated the motion as one for summary judgment and granted the motion, holding that because the Hospital assumed a duty to prevent K.W. from engaging in self-harm, comparative negligence and assumption of risk were not available defenses. On the same day, the trial court issued an order "resolving outstanding discovery disputes." In that order, the court precluded the Hospital from discovering K.W.'s pre-incident mental health records. The Hospital petitioned for an order to show cause under C.A.R. 21, and this court accepted the petition and issued the order.

## II. Standard of Review

¶ 11 First, we review a grant of summary judgment de novo. *Amos v. Aspen Alps 123, LLC*, 2012 CO 46, ¶ 13, 280 P.3d 1256, 1259. Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. C.R.C.P. 56(c); *HealthONE v. Rodriguez ex rel. Rodriguez*, 50 P.3d 879, 887 (Colo. 2002). Generally speaking, "[t]he existence and scope of a legal duty is a question of law." *Hesse v. McClintic*, 176 P.3d 759, 762 (Colo. 2008).

¶ 12 Second, under C.A.R. 21, this court will review whether a trial court's discovery order constituted an abuse of discretion only where "the normal appellate process would prove inadequate"—specifically, where the allegedly erroneous discovery ruling will "significantly hinder" a party's ability to prove or defend his case on the merits. *Warden v. Exempla, Inc.*, 2012 CO 74, ¶ 16, 291 P.3d 30, 34.

## III. Analysis

¶ 13 The Hospital asserts that the trial court erred when it dismissed the Hospital's affirmative defenses of comparative negligence and assumption of risk, and that the trial court improperly precluded the Hospital from obtaining discovery of K.W.'s pre-incident medical records. We first address the dismissal of the Hospital's affirmative defenses on summary judgment and then turn to the court's discovery ruling. We hold that the trial court properly dismissed the Hospital's comparative negligence and assumption of risk defenses. Given this holding, we need not address the merits of the Hospital's challenge to the court's discovery ruling and we therefore discharge the rule.

### A. The Hospital Cannot Assert K.W.'s Comparative Negligence as a Defense

¶ 14 The Hospital contends that section 13–21–111, C.R.S. (2015), requires the trial court to allow a comparative fault defense.[2] Section 13–21–111 mandates that fault[3] be apportioned between plaintiffs and defendants in a negligence action if there is contributory negligence on the part of the injured person, and if that negligence was "not

---

**2.** The Hospital asserted affirmative defenses of both "comparative negligence" and "assumption of risk." Because the question of a plaintiff's assumption of risk is folded within the comparative negligence analysis, in this opinion we will omit references to assumption of risk and simply use the terms contributory negligence, comparative negligence, or comparative fault. *See* § 13–21–111.7, C.R.S. (2015) (explaining that "assumption of a risk by a person shall be considered" as part of and "pursuant to" the comparative negligence inquiry under section 13–21–111, C.R.S. (2015)).

**3.** Prior to the enactment of the comparative negligence scheme via section 13–21–111 in 1971,

Colorado followed the common law doctrine of contributory negligence, which completely barred recovery when a plaintiff negligently contributed—even a little—to her own injury. *See Mountain Mobile Mix, Inc. v. Gifford*, 660 P.2d 883, 884 (Colo. 1983). The comparative negligence scheme did not do away with the concept of contributory negligence—it simply modified the common law rule to allow a negligent plaintiff to recover if "his or her negligence was less than that of the defendant." § 13–21–111. Any damages awarded to the plaintiff are to be "diminished in proportion to" the plaintiff's degree of fault. *Id.; see Gordon v. Benson*, 925 P.2d 775, 777 (Colo. 1996).

as great as the negligence of the person against whom recovery is sought."

¶ 15 The Hospital cannot assert a defense of comparative negligence, however, if K.W. could not have been negligent as a matter of law.[4] And K.W. could have been negligent as a matter of law only if he "owed a duty of care under the circumstances" not to harm himself. *Hesse,* 176 P.3d at 762; *Harvey v. Farmers Ins. Exch.,* 983 P.2d 34, 37–38 (Colo. App. 1998) ("[A] party or nonparty may not be apportioned fault on a claim if it did not owe a duty . . . .").

¶ 16 Individuals have a general duty to act with ordinary care for their own safety. *Seal v. Lemmel,* 140 Colo. 387, 344 P.2d 694, 696 (1959). However, this court has held that a defendant may not raise a defense of comparative negligence as a matter of law if, under the circumstances, the plaintiff "did all he was legally required to do," and had no duty to do more. *Ringsby Truck Lines, Inc. v. Bradfield,* 193 Colo. 151, 563 P.2d 939, 942 (1977) (holding that where defendant was driving toward plaintiff in the wrong lane, plaintiff who slowed and pulled over was "not required to drive his vehicle into the ditch" and thus comparative negligence was properly withdrawn from the jury's consideration); *see also Seal,* 344 P.2d at 696 (explaining that plaintiff was not obliged to reject the opportunity to ride in a sheriff's car as a guest despite being under the general duty to act with care for his own safety and therefore the doctrine of assumption of risk did not apply).

¶ 17 Whether the trial court properly prevented the Hospital from asserting K.W.'s fault as a defense is a mixed question of law and fact, *Perreira v. State,* 768 P.2d 1198, 1214 (Colo. 1989), that requires us to determine whether the Hospital assumed any duty K.W. had not to act self-destructively—because if the Hospital assumed K.W.'s duty, then K.W. cannot be burdened with comparative fault.

¶ 18 We first determine that (1) the Hospital assumed an affirmative duty to protect K.W. from self-harm and (2) the nature and scope of that assumption of duty subsumed K.W.'s own duty not to harm himself. We then explain why a capacity-based theory of comparative negligence does not apply in this case.

### 1. The Hospital Assumed a Duty to Prevent K.W. From Harming Himself

¶ 19 The Hospital agreed to provide mental healthcare services to K.W. upon his admission to the Hospital. As such, it owed him a general duty of care consistent with Colorado's professional standards for physicians.[5] The Hospital does not dispute that it was bound by this general duty.

¶ 20 In addition, the Hospital undertook to prevent K.W. from suffering harm as a result of his suicidal impulses when the Hospital admitted him to the inpatient psychiatric unit. As such, the precise issue presented in this case is whether, by doing so, the Hospital assumed an additional affirmative duty of care to K.W., and, if so, whether the Hospital's assumed duty subsumed K.W.'s own duty of self-care. We answer both questions in the affirmative.

¶ 21 In general, a party assumes another's duty of care and may be subject to liability for breaching that duty when the party voluntarily undertakes to render a service. *See Jefferson Cty. Sch. Dist. R–1 v.*

---

4. A plaintiff's negligence is "determined and governed by the same tests and rules as the negligence of the defendant." W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 65, at 453 (5th ed. 1984); *see also Hesse v. McClintic,* 176 P.3d 759, 762 (Colo. 2008). "[C]omparative negligence rules are applicable only where there is evidence presented which would substantiate a finding that both parties are at fault, and the inability to prove any negligence on the part of plaintiff eliminates the operation of the rule." *Gordon,* 925 P.2d at 778 (quoting *Powell v. City*

*of Ouray,* 32 Colo.App. 44, 507 P.2d 1101, 1105 (1973)).

5. A non-specialist physician is under a general duty to her patient to "act consistently with the standards required of the medical profession in the community," while a specialist must treat the patient in accordance with the standard of "a reasonable physician practicing in that specialty." *Jordan v. Bogner,* 844 P.2d 664, 666 (Colo. 1993); *Melville v. Southward,* 791 P.2d 383, 387 (Colo. 1990).

*Justus*, 725 P.2d 767, 770–71 (Colo. 1986) (adopting Restatement (Second) of Torts § 323 (Am. Law. Inst. 1965) ("Negligent Performance of Undertaking to Render Services")); *cf. DeCaire v. Pub. Serv. Co.*, 173 Colo. 402, 479 P.2d 964, 966–67 (1971) (applying a related section of the Restatement (Second) of Torts (Am. Law Inst. 1965)—namely, section 324A ("Liability to Third Person for Negligent Performance of Undertaking")). Under the assumed duty doctrine, as adopted by this court in *Justus*, the question of whether the Hospital assumed a duty rests on two factual findings: (1) whether the Hospital, "through its affirmative acts or through a promise to act, undertook to render a service that was reasonably calculated to prevent the type of harm that befell the plaintiff" and (2) whether the plaintiff "relied on the [Hospital] to perform the service." 725 P.2d at 771. Here, the undisputed facts show clearly that the Hospital undertook not only to render mental healthcare services to K.W. but also to prevent him from suffering harm by acting on his suicidal impulses. It is also clear and not subject to any genuine dispute that K.W. and his parents relied on the Hospital to provide those services. Therefore, the *Justus* test has been satisfied and we hold that the Hospital assumed an affirmative duty to prevent K.W. from harming himself.

¶ 22 Nevertheless, the fact that the Hospital assumed this duty does not conclusively determine whether, under these facts, K.W.'s duty of self-care was eliminated for comparative fault purposes. In order to decide whether the Hospital's assumed duty subsumed K.W.'s own duty not to harm himself, we must carefully evaluate the scope of the duty assumed by the Hospital. "[T]he scope of any assumed duty ... must be limited to the performance with due care of that service undertaken, because the [defendant's] liability under a voluntarily assumed duty can obviously be no broader than the undertak-

ing actually assumed." *Id.* at 772 n. 5. In other words, when a defendant assumes a duty to a plaintiff, "what counts as contributory negligence is determined largely by the scope of the defendant's duty." Dan B. Dobbs, *The Law of Torts* § 200, at 500 (2000). If the defendant's duty to protect the plaintiff contemplates, encompasses, and thereby subsumes the plaintiff's duty not to act in a certain way, then the plaintiff cannot be faulted for acting in that way. *Cf. Justus*, 725 P.2d at 772 n. 5 (noting that "the scope of [a defendant's] undertaking" is "limited to the question of whether or not it encompassed the task of preventing respondent from [taking the actions that led to harm]"). If the duty undertaken by the defendant and the harm to the plaintiff precisely match—in that the purpose of the undertaking was to prevent the harm—then it would be improper to allow the defendant to use the occurrence of that type of harm as a defense, "since that was the very thing he was obliged to prevent." Dobbs, *supra*, at 500.[6]

¶ 23 With no Colorado case directly on point, we look to the decisions of other jurisdictions for persuasive guidance. *People v. Weiss*, 133 P.3d 1180, 1187 (Colo. 2006). In *Tomfohr v. Mayo Foundation*, 450 N.W.2d 121, 122 (Minn. 1990), the Supreme Court of Minnesota held that a comparative negligence defense was not appropriate in an inpatient suicide case. There, a patient voluntarily admitted himself to a psychiatric hospital, where he was diagnosed with severe depression. *Id.* He told hospital authorities that he had suicidal ideation, though he "denied any current thoughts of suicide." *Id.* He was "locked in a psychiatric ward and placed on suicidal precaution" but "while alone in his room[,] committed suicide by hanging." *Id.* The court rejected the comparative negligence defense, reasoning that "in this specific type of case, the mental condition of the patient exists prior to the

---

**6.** It is worth noting that this reasoning does not create a rule that no patient can be comparatively negligent in a medical malpractice case. A patient who, for example, fails to follow a physician's instructions or fails to cooperate in her treatment by providing an inadequate medical history will likely be subject to a comparative fault defense. *Kildahl v. Tagge*, 942 P.2d 1283,

1285–86 (Colo. App. 1996) (noting that a plaintiff's failure to provide an adequate medical history or cooperate in treatment can provide a basis for comparative negligence); *see also, generally, Harding v. Deiss*, 300 Mont. 312, 3 P.3d 1286, 1288–89 (2000) (providing an overview of the availability of comparative negligence as a defense in medical malpractice cases).

hospital's negligent act, and it is that condition which gives rise to the hospital's duty of care and which defines the scope of that duty." *Id.* at 125. The court thus concluded that, unlike a case where a patient is injured in some unrelated way while at the hospital (such as falling out of bed when the patient is there for psychiatric therapy), comparative negligence may not be asserted where the injuries suffered were "the result of the very thing the patient was attempting to prevent by hospitalization." *Id.* This case provides a straightforward rule: If a hospital assumes a duty to protect and treat a patient for a specific condition, and if the patient is injured by a foreseeable event directly related to that condition, then the hospital cannot assert that occurrence as part of a comparative negligence defense.

¶ 24 In this case, as in *Tomfohr*, the scope of the Hospital's duty was straightforward: it agreed to use reasonable care to prevent a known suicidal patient, K.W., from attempting to commit or committing suicide when he was in the Hospital's exclusive care for treatment of that condition. Here, the Hospital's assumed duty—to protect K.W. from his own suicidality—was aimed at preventing precisely the type of harm that ultimately befell K.W. Moreover, the action K.W. actually took—hanging himself with material found in his room—was foreseeable.[7] K.W. was admitted to the mental health unit for inpatient care following a serious suicide attempt. The Hospital knowingly placed him under "suicide precautions" because he was "unable to contract" for his own safety and was, in his doctor's words, "clearly a danger to himself." Accordingly, under these facts, K.W.'s "obligation of [self-care] was transferred" to and assumed by the Hospital and he could not have been at fault as a matter of law. *Tomfohr*, 450 N.W.2d at 125.

¶ 25 When a hospital admits a person into its custody who the hospital knows is actively suicidal, and when the admission is for the purpose of preventing that person's self-destructive behavior, the hospital assumes a duty to use reasonable care in preventing the patient from engaging in such behavior. We hold that this duty subsumes any fault attributable to the plaintiff for harm suffered as a result of those self-destructive acts. To hold otherwise would be to ignore the effect of a hospital's willful undertaking and would "render meaningless" the hospital's assumption of an affirmative duty to use reasonable care in protecting the patient from his known desire to harm himself. *McNamara v. Honeyman*, 406 Mass. 43, 546 N.E.2d 139, 143, 146–47 (1989) (holding that where a "suicidally active" patient was admitted to the hospital and committed suicide by hanging, "there can be no comparative negligence where the defendant's duty of care includes preventing the self-abusive or self-destructive acts that caused the plaintiff's injury"); *see also Cowan v. Doering*, 111 N.J. 451, 545 A.2d 159, 167 (1988) (refusing to allow a comparative negligence defense where the patient was admitted to the hospital after a suicide attempt and jumped from her hospital window); Restatement (Second) of Torts § 449, cmt. b (Am. Law Inst. 1965) ("To deny recovery because the other's exposure to the very risk from which it was the purpose of the duty to protect him resulted in harm to him, would be to ... make the duty a nullity.").

¶ 26 The rule we create today does not, as the Hospital asserts, "essentially impose[ ] strict liability on hospitals caring for suicidal patients" nor does it require a hospital to be the "insurer of its patients' safety" by preventing all suicide attempts. A plaintiff will still be required to prove that the defendant had a duty to prevent foreseeable harm, that it breached that duty, and that defendant's breach proximately caused the harm. *See, e.g., Cowan*, 545 A.2d at 166 (noting that "even though plaintiff's conduct had no relevance in terms of her fault or contributory negligence, the evidence submitted concerning her conduct was considered by the jury

---

7. "A negligence claim requires two distinct and separate foreseeability analyses. First, foreseeability is an integral element of duty. Second, foreseeability is the touchstone of proximate cause. The former is a question of law for the court; the latter is a question of fact for the jury at trial." *Westin Operator, LLC v. Groh*, 2015 CO 25, ¶ 33 n. 5, 347 P.3d 606, 614 n. 5 (citations omitted).

as it related to defendant's ultimate responsibility, through the concept of proximate cause"). Our holding today simply means that when the patient's suicidal acts "are the very acts which the medical provider had a duty to prevent, the provider's own failure to prevent the suicide should not create its own defense." *Tomfohr*, 450 N.W.2d at 125.

¶ 27 We also caution that our holding is limited by the factual situation presented here.[8] It is undisputed that the Hospital had knowledge of K.W.'s suicidality and his recent suicide attempts. With this knowledge, the Hospital admitted K.W. to its secure mental health unit and placed him under "high suicide precautions" for the purpose of preventing him from attempting to commit suicide. The same day he was admitted, while in the Hospital's exclusive custody, K.W. hung himself with material that was in his room and suffered a devastating brain injury. Under these circumstances, the Hospital assumed the duty to prevent just such an injury, and it cannot assert K.W.'s fault as a defense.

## 2. The Capacity–Based Standard For Evaluating a Mentally Ill Plaintiff's Negligence Does Not Apply Under These Circumstances

¶ 28 The Hospital advocates a capacity-based standard[9] for comparative negligence where a mentally ill patient injures himself by attempting suicide while in a hospital's secure custody as an inpatient under high suicide precautions. Using its proposed standard, the Hospital asserts that summary judgment was inappropriate because the

Hospital presented evidence that K.W. was capable of acting rationally. The Hospital contends that by voluntarily harming himself, K.W. assumed the risk of the injuries he ultimately suffered and is at least partly at fault. However, because we have concluded that (1) the Hospital assumed an affirmative duty to protect K.W. from a certain type of foreseeable harm (namely, self-harm) and (2) the type of harm K.W. suffered fell squarely within the scope of that affirmative duty, an evaluation of K.W.'s capacity for negligence is irrelevant because he had no legal duty not to act self-destructively.

¶ 29 We find the New Jersey Supreme Court's reasoning in *Cowan v. Doering*, 111 N.J. 451, 545 A.2d 159 (1988), persuasive on this point. There, much like here, the patient was admitted to the hospital for treatment as a result of and immediately following a suicide attempt at home. *Id.* at 161. She was left unattended and again attempted suicide by jumping from the window of her hospital room. *Id.* The court held that the capacity-based standard for evaluating a mentally ill person's negligence, while typically proper, nevertheless did not apply under the facts of the case "because the plaintiff's inability to exercise reasonable self-care attributable to her mental disability was itself subsumed within the duty of care defendants owed to her." *Id.* at 163. We agree that a hospital's "professional duty of care encompasses, and is shaped by, the plaintiff-patient's medical condition" as it is known to the hospital. *Id.* at 164; *accord Tomfohr*, 450 N.W.2d at 125. Thus here, as

---

8. As the Iowa Supreme Court aptly stated, "[e]ach case turns on its uniquely tragic facts." *Mulhern v. Catholic Health Initiatives*, 799 N.W.2d 104, 107 (Iowa 2011). We therefore decline to rely on the legal reasoning contained in factually distinct cases. For example, both parties have cited a number of cases involving jail suicides—a situation we need not address here. *See, e.g., Hickey v. Zezulka*, 439 Mich. 408, 487 N.W.2d 106, 123 (1992) (suicide in holding cell); *Gregoire v. City of Oak Harbor*, 170 Wash.2d 628, 244 P.3d 924, 926, 931 (2010) (jail suicide). The Hospital also argues that this court should follow the reasoning of our court of appeals in *Sheron v. Lutheran Medical Center*, 18 P.3d 796, 801 (Colo. App. 2000), but that case involved a patient who committed suicide outside

of the hospital, a day after being discharged. Moreover, in *Sheron* the court of appeals did not address, and was not asked to address, the question of whether the decedent had a duty. *See* 18 P.3d at 801 ("Plaintiff does not dispute that the provisions of § 13–21–111(1) apply in this case. Rather, she argues that there was no evidence that [the decedent] was negligent.... "). Accordingly, we find *Sheron* and similar noncustodial suicide cases unhelpful.

9. *See, e.g., Sheron*, 18 P.3d at 801 (noting that a mentally ill person may be comparatively negligent unless the evidence discloses that the person was "so mentally ill that he is incapable of being negligent" (citing *Hobart v. Shin*, 185 Ill.2d 283, 235 Ill.Dec. 724, 705 N.E.2d 907 (1998))).

in *Cowan*, the patient's capacity for negligence is irrelevant. 545 A.2d at 164.

## B. The Trial Court's Discovery Ruling

¶ 30 If the Hospital had been able to assert comparative negligence, the pre-incident medical records it seeks would likely have been relevant. But, given our holding today, we need not address the trial court's discovery ruling preventing the Hospital from obtaining K.W.'s pre-incident mental health records.

¶ 31 This court will not typically review a trial court's pretrial discovery order, unless the relatively rare situation presents itself in which a remedy on appeal would be inadequate. *Ortega v. Colo. Permanente Grp., P.C.*, 265 P.3d 444, 447 (Colo. 2011). We will address a pretrial discovery dispute in an original proceeding only if the ruling "will have a significant effect on a party's ability to litigate the merits of the controversy and the damage to a party could not be cured on appeal." *Kerwin v. Dist. Ct.*, 649 P.2d 1086, 1088 (Colo. 1982); *see also Warden*, ¶ 16, 291 P.3d at 34 ("This Court exercises its original jurisdiction under C.A.R. 21 to review whether a trial court abused its discretion in situations where the normal appellate process would prove inadequate."). That is not the case here. As the trial court noted, the Hospital already has access to documents in its own records that "are directly related to K.W.'s pre-incident mental health," information that is "clearly relevant to the care needed to be taken with K.W. during his admission to the hospital" and thus "within the waiver of the privilege." Given the nature of the claims in this case and the information already possessed by the Hospital, we do not believe that the denial of the Hospital's request to access K.W.'s pre-incident mental health records will have a "significant effect" on the Hospital's "ability to litigate the merits of the controversy." *Kerwin*, 649 P.2d at 1088.

¶ 32 The Hospital's challenge of the discovery order is not an appropriate matter for this court to decide on C.A.R. 21 review, particularly given our holding today eliminating the Hospital's comparative negligence defense. Accordingly we need not—and do not—decide this issue today.

## IV. Conclusion

¶ 33 Because K.W. could not have been at fault under these circumstances as a matter of law, the trial court correctly dismissed the Hospital's affirmative defenses of comparative negligence and assumption of risk. Given this conclusion, we need not address the trial court's discovery ruling. We therefore discharge the rule on both issues.

JUSTICE EID does not participate.